IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| KELLY L. ASHTON, Individually and as the Independent Executor of the Estate of Donald Ray Ashton, Deceased, | § § § § | |
| Plaintiff, | § § | |
| v. | § § | Cause No. 3:09-CV-00759-B |
| KNIGHT TRANSPORTATION, INC. and GEORGE M. MUTHEE, | § § § | |
| Defendants. | § § § | |

**PLAINTIFF KELLY ASHTON'S MOTION
FOR SANCTIONS FOR SPOLIATION
OR
FOR AN ADVERSE-INFERENCE JURY INSTRUCTION
<u>AND BRIEF IN SUPPORT</u>**


**(This document relates to evidentiary and jury-instruction issues, which
the Court may consider at the pretrial conference, Friday, September 24, 2010.)**

**TABLE OF CONTENTS**

Table of Authorities…………………………………………………………………………iii

   I.      Introduction……………………………………………………………………1

   II.    Trooper Ballinger's Assessment……………………………………………...2

   III.  Standards………………………………………………………………………4

   IV.  The Acts of Spoliation and Bad Discovery Conduct……………………..……...6

        A.  Muthee hit Don Ashton, fled the scene, and  deprived
            the Kansas Highway Patrol of the opportunity
            to examine the tractor-trailer on August 11, 2007…...……………………………6

        B.  Muthee continued driving to Sparks, Nevada,
            and changed the tractor's two front steer tires
            there on August 13.………………………………………………………..7

        C.  Robert Steve McKinzie scraped what
            he thought was blood or tissue from
            the tractor on August 25……………………………………………………...8

        D.  Ryan Rezzelle conducted destructive
            testing in September……………………………………………………….8

        E.  Other Discovery Misconduct …………………………………………………..9

              1.  McKinzie's August 25, 2007 Inspection
                of the Volvo Tractor……………………………………………….....9

              2.  Driver Violation Inquiry……………………….........................11

              3.  QUALCOMM or Email-Like Messages………………………..13

   V.  Sanctions or an Adverse-Inference Jury Instruction ………………………………16

        A.  The Court should strike Muthee's and Knight
            Transportation's pleadings or defenses………………………………………..16

              1.  Leaving the Scene; Steer Tires………………………………….....16

               2.  Scraping the Volvo Tractor for Evidence……………………...18

3.  Testing the Ostensible Samples…………………………………………..21

B.  Alternatively, the Court should rule that the following
facts are established…………………………………………………………...22

C.  Alternatively, the Court should give adverse-inference
instructions to the jury…………………………………………………………...22

1.  Adverse-Inference Instruction…………………………………………22

2.  Or the predicate questions of whether a party
committed spoliation may go to the jury………………………………24

D.  In any event, the Court should rule that Ashton has
Met her burden on causation, or it should shift the burden
to Knight Transportation and Muthee……………………………………………25

E.  Also in any event, the Court should exclude evidence
or testimony based on Rezzelle's ostensible work………………………………26

VI. Conclusion & Prayer for Relief ……………………………………………………27

Certificate of Service…………………………………………………………………….29

# TABLE OF AUTHORITIES

*Allen v. United States*, 164 U.S. 492,
17 S. Ct. 154, 156 (1896)……………………………………………………………...17

*Burlington N. & S.F. Ry. Co.*,
129 S. Ct. 1870 (2009)……………………………………………………………...25

*Cate v. Samsonite Furniture Co.*,
No. 03A01-9606-CV-00228,
1994 WL 706620
(Tenn. Ct. App. Dec. 19, 1994)…………………………………………………..22

*Celotex Corp. v. Tate*,
797 S.W.2d 197
(Tex. App.—Corpus Christi 1990, writ dism'd)…………………….………………25

*Condrey v. SunTrust Bank of Georgia*,
431 F.3d 191 (5th Cir. 2005)…………………………………………………...4

*Escobar v. City of Houston*,
No. 04-1945, 2007 WL 2900581
(S.D. Tex. Sept. 29, 2007)……………………………………………………...4, 5

*GW Equity LLC v. Xcentric Ventures LLC*,
No. 3:07-CV-976-O, 2009 WL 62168
(N.D. Tex. Jan. 9, 2009)…………………………………………………………...4

*King v. Illinois Central R.R.*,
337 F.3d 550 (5th Cir. 2003)…………………………………………………...4

*Nation-Wide Check Corp. v. Forest Hills Distribs, Inc.*,
692 F.2d 214 (1st Cir. 1982)……………………………………………………5

*Pension Committee of Univ. of Montreal Pension Plan
v. Banc of America Securities, LLC*,
685 F. Supp. 456 (S.D.N.Y. 2010)……………….…………………………………23, 24

*Residential Funding Corp. v. DeGeorge Financial Corp.*,
306 F.3d 99 (2d Cir. 2002)…………………………………………………………...5

*Rimkus Consulting Group, Inc. v. Cammarata*,
688 F. Supp. 2d 598 (S.D. Tex. 2010)……………………………………...4, 5, 23, 24, 25

*Ruiz v. Guerra*,

293 S.W.3d 706
(Tex. App.—San Antonio 2009, no pet.)…………………………………………..25

*Russell v. Univ. of Texas of the Permian Basin*,
No. 06-50102, 234 Fed. Appx. 195,
2007 WL 1879157 (5th Cir. June 28, 2007)…………………………………………..22

*Sedrati v. Allstate Life Ins. Co.*,
185 F.R.D. 388 (M.D. Ga. 1998)…………………………………………………...22

*Summers v. Tice*, 33 Cal. 2d 80, 85-86 (Cal. 1948)…………………………………...25

*Super Future Equities, Inc. v. Wells Fargo Bank Minnesota, N.A.*,
No. 3:06-CV-0271-B,
2008 WL 3261095 (N.D. Tex. Aug. 8, 2008)…………………………………..4, 5

*Tandycrafts, Inc. v. Bublitz*,
No. 3:97-CV-1074-T,
2002 WL 324290 (N.D. Tex. Feb. 27, 2002)…………………………………...4, 5

*Trapnell v. Sysco Food Servs, Inc.*,
850 S.W.2d 529 (Tex. App.—Corpus Christi 1993)…………………………………..25

*United States v. Murphy*,
996 F.2d 94 (5th Cir. 1993)…………………………………………………..17

*United States v. Veltre*,
591 F.2d 347 (5th Cir. 1979)…………………………………………………17

## RULES, CODES AND OTHERS

Fed. R. Civ. P. 26(a)(1)(A)(ii)……………………………………………………….9

49 C.F.R. § 392.2……………………………………………………………...16

49 C.F.R. § 390.15(a)…………………………………………………………20

State Bar of Texas, Texas Pattern Jury Charges, PJC 4.1, 2.4 (2006)…………………………...25

## I.  Introduction

There's a reason that Defendant Knight Transportation, Inc. wants to concede that it is liable in compensatory damages for the injuries, which Defendant George Muthee caused by negligently killing Don Ashton on August 11, 2007 and why both defendants want all evidence of their post-crash conduct excluded:  They want to escape the consequences of their spoliation of evidence.  As Kansas Highway Patrol Troop Kip Ballinger said about Knight Transportation and its ostensible expert, Robert Steve McKinzie, by September 2009, "In other words, they have stymied our investigation all along."[1]  After negligently hitting and killing Don Ashton while driving a commercial 18-wheel tractor-trailer over the federal hours limits, Muthee fled the scene and deprived the police of the opportunity to examine the tractor-trailer while the evidence was still fresh or conduct the mandatory drug test.  In fact, he continued driving on his tires approximately 1,400 miles to Sparks, Nevada, where an outside vendor changed the tractor's two front steer tires.  Knight Transportation contends that the tires are now lost because it doesn't control the vendor.  But Knight Transportation has a service facility in Sparks.  Also, Knight Transportation's and Muthee's agents—Robert Steve McKinzie and Ryan Rezzelle— intentionally scraped what McKinzie thought was blood or tissue from the tractor on August 25, 2007 (while the company was requiring the police to get a warrant to search the tractor) and performed destructive testing on the material.  Although the circumstances of these acts alone show bad faith, additional evidence does as well.  Knight Transportation and Muthee concealed the fact of McKinzie's August 2007 inspection of the tractor until after Ashton's expert-

---

[1] Email from Trooper Kip Ballinger, to K. Calkins, Republic County Attorney's Office, 1-2 (Sept. 30, 2009), Tab 1, App 48-49 (stating that Knight Transportation was in violation of 49 C.F.R. § 390.15(a), which requires a trucking company to make all records and information pertaining to an accident available to a state law-enforcement agency, by withholding statements of witnesses, denying an interview with Muthee, and failing to provide  "true and correct response to any question of the inquiry") ("In other words, they have stymied our investigation all along."); Ballinger's Depo. at 7:13-15, 8:2-21, 120:4-121:12, Tab 37 (proving up his email correspondence as Ex 16 to his deposition).

**Plaintiff Ashton's Motion Regarding Spoliation**                                                    **– Page 1**

designation deadline, when forced to reveal it by interrogatory in April 2010.  Knight

Transportation delayed production of a document, which showed that it knew that Muthee was

driving over hours in the days and hours leading up to the crash, until after the expert-

designation deadlines, and it misstated its production to the Court.  Knight Transportation also

withheld production of the QUALCOMM or email-like communications between Muthee and

the company on August 10–13, 2007, and, when it produced the materials, it refused to produce

them in their original format, it produced them in a coded format, and it failed to produce any

communications between 10:45 p.m., August 10, to 6:45 a.m. on August 11.  Also, the

defendants never listed Rezzelle as a person with knowledge or designated him as an expert.

Therefore, the Court should either strike the defendants' pleadings or defenses, rule that specific

facts are established, give adverse-inference instructions to the jury, rule that Ashton has met her

burden on causation or shift it to the defendants, and exclude all evidence based on Rezzelle's

ostensible work.

## II.  Trooper Ballinger's Assessment

Between the date of Don Ashton's death on August 11, 2007 and today, Kip Ballinger

has been a trooper with the Kansas Highway Patrol.[2]  He is a member of the Critical Highway

Accident Response Team, investigated the crash on US-81, and produced a report.[3]  Part of his

email communication is at Tab 1 (App 1–51).[4]  His emails document his efforts to obtain

documents and information from Knight Transportation, an inspection of Muthee's tractor and

trailer, and an interview with Muthee.  Here are some of his quotes—

---

[2] *See* Ballinger's Depo. at 7:13-15, 7:22-8:9, Tab 37.

[3] *See* Ballinger's Depo. at 8:10-9:15, Tab 37.

[4] *See* Ballinger's Depo. at 120:4-121:12, Tab 37 (proving up his email correspondence as Ex 16 to his deposition).

**Plaintiff Ashton's Motion Regarding Spoliation**                                                    **– Page 2**

• "The administrators in my organization are growing frustrated with the delay and are again inquiring on the status on this. Please advise."[5] Ballinger to Lee Baty, one of Knight Transportation's lawyers.[6]

• "As you are aware, [49] CFR 390.15 requires that a motor carrier shall give an authorized representative all reasonable assistance in the investigation of any accident. They are clearly not assisting us on this particular issue [an interview with Muthee], but rather inhibiting our efforts to investigate this crash. Would you please pay Knight Transportation a visit and have a little 'come-to-Jesus' meeting with them regarding their duties and the importance and urgency of this matter."[7]

• "Criminal charges have now been filed on George Muthee, the hit-and-run driver. Despite multiple requests to both the attorney and to Knight Transp., they have refused to provide the information on their driver file on George Muthee. I believe that there may be critical information on this case contained in those records. They are required by 49 CFR 390.15(a) to provide this information. They have obstructed my investigation by withholding this information."[8]

• "We need to aggressively argue against Knight Transportation[']s Motion to Quash Subpoena for records. * * * As far as I'm concerned, Knight Transportation, both directly and through its legal counsel, is in violation of this statute [49 C.F.R. §390.15(a)]. They have refused or ignored all of my requests to obtain any statements made by George Muthee regarding the crash. I have a considerable amount of email correspondence requesting their cooperation in investigating this crash. They would not make him available for an interview. Knight has obstructed the legal process all the way through and is subject to criminal charges themselves. The truck, trailer, driver, and records were in their possession, when it was determined that their truck was involved. Muthee changed out two tires in Las Vegas on the following day. Knight may have had knowledge of the crash if they had to authorize the purchase of two tires. They immediately retained Steve McKinzie and flew him to Ontario, CA to inspect the truck before notifying Law Enforcement that they had the vehicle. McKinzie made scrapings from the vehicle for his analysis, potentially destroying valuable evidence prior to being examined by law enforcement. Knight stored the vehicle outside in an open lot where it was unsecured and parts were cannibalized from it prior to us being able to have it inspected. In other words, they have stymied our investigation all along."[9]

---

[5] Email from Ballinger to Baty, 1 (Oct. 9, 2007), Tab 1, App 14.

[6] *See* Sant's Depo. at 7:2, 21-24, 131:14-132:5, 142:2-11, 142:13-143:18, 250:14-251:3, Tab 34.

[7] Email from Ballinger to Warren Mallen, 1-2 (Oct. 14, 2007), Tab 1, App 18-19.

[8] Email from Ballinger to Mary Parmentier, 1 (Sept. 1, 2009), Tab 1, App 47.

[9] Email from Ballinger to K. Calkins, 1-2 (Sept. 30, 2009), Tab 1, App 48-49.

**Plaintiff Ashton's Motion Regarding Spoliation**                                              **– Page 3**

### III.  Standards

This Court imposed sanctions for spoliation in *Tandycrafts, Inc. v. Bublitz*,[10] and the U.S.

District Court for the Southern District of Texas conducted an extensive review of spoliation law

in imposing sanctions in the form of adverse jury instructions in *Rimkus Consulting Group, Inc.*

*v. Cammarata*.[11]

Federal law generally governs spoliation issues, even in a diversity case.[12]  Spoliation is

the destruction or the significant and meaningful alteration of evidence,[13] when a party has a duty

to preserve it.[14]  A duty arises when a party has notice that the evidence is relevant to litigation or

should know that the evidence may be relevant to future litigation.[15]  Generally, sanctions for

spoliation must be based on a party's bad faith or bad conduct.[16]  A court may consider the

degree of culpability of the destroying party and the prejudice to the aggrieved party.[17]  Whether

preservation conduct is acceptable in a given case turns on what is reasonable; that is, whether

---

[10] *See Tandycrafts, Inc. v. Bublitz*, No. 3:97-CV-1074-T, 2002 WL 324290 (N.D. Tex. Feb. 27, 2002).

[11] *See Rimkus Consulting Group, Inc. v. Cammarata*, 688 F. Supp. 2d 598, 612 (S.D. Tex. 2010).

[12] *See King v. Illinois Central R.R.*, 337 F.3d 550, 555-56 (5th Cir. 2003).

[13] *See Rimkus Consulting Group, Inc. v. Cammarata*, 688 F. Supp. 2d 598, 612 (S.D. Tex. 2010) ("Spoliation is the destruction or significant and meaningful alteration of evidence.").

[14] *See Rimkus Consulting*, 688 F. Supp. 2d at 612; *Escobar v. City of Houston*, No. 04-1945, 2007 WL 2900581, *17 (S.D. Tex. Sept. 29, 2007).

[15] *See Rimkus Consulting*, 688 F. Supp. 2d at 612-13 (collecting cases).

[16] *See King*, 337 F.3d at 556 (stating that a party seeking sanctions must show the "bad conduct" or the "bad faith" of the destroying party); *Super Future Equities, Inc. v. Wells Fargo Bank Minnesota, N.A.*, No. 3:06-CV-0271-B, 2008 WL 3261095, *12 (N.D. Tex. Aug. 8, 2008) (identifying "bad conduct" or "bad faith" as spoliation's predicate) (citing *Condrey v. SunTrust Bank of Georgia*, 431 F.3d 191, 203 (5th Cir. 2005)); *GW Equity LLC v. Xcentric Ventures LLC*, No. 3:07-CV-976-O, 2009 WL 62168, *8 (N.D. Tex. Jan. 9, 2009) (same as *Super Futures*); *Rimkus Consulting*, 688 F. Supp. 2d at 614 (collecting cases from various federal jurisdictions); *Escobar*, No. 04-1945, 2007 WL 2900581, at *17 (citing *King*).

[17] *See Rimkus Consulting*, 688 F. Supp. 2d at 613 ("Determining whether sanctions are warranted and, if so, what they should include, requires a court to consider both the spoliating party's culpability and the level of prejudice of the party seeking discovery.").

what was done or not done was proportional to the circumstances and consistent with clearly established standards.[18] But courts have also fashioned remedies to relieve a party of the unfair prejudice of another's negligent destruction of evidence under the principle that parties should bear the risk of their own negligence.[19] Also, a court may consider whether the lost evidence would have been relevant.[20] In the case of evidence destroyed before litigation, then a federal court uses its inherent powers to fashion a remedy.[21] For evidence destroyed during litigation, a court uses Rule 37.[22] Remedies or sanctions range from striking a party's pleadings or defenses, ruling that given facts are established, or giving an adverse-inference instruction to a jury.[23]

---

[18] *See Rimkus Consulting*, 688 F. Supp. 2d at 613 & n.8.

[19] *See Rimkus Consulting*, 688 F. Supp. 2d at 615 ("The court applied case law in the Second Circuit, including the language in *Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99, 108 (2d Cir. 2002) (stating that the sanction of an adverse inference may be appropriate in some cases involving negligent destruction of evidence because each party should bear the risk of its own negligence.") (citing other cases, which imposed sanctions for the negligent destruction of evidence).

[20] *See Rimkus Consulting*, 688 F. Supp. 2d at 615-16 (collecting cases).

[21] *See Rimkus Consulting Group*, 688 F. Supp. 2d at 611 (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-46, 111 S. Ct. 2123, 2132 (1991)); *see also Tandycrafts, Inc. v. Bublitz*, No. 3:97-CV-1074-T, 2002 WL 324290, *5 (N.D. Tex. Feb. 27, 2002) (noting a court's inherent power to sanction bad-faith conduct in the destruction of evidence).

[22] *See Rimkus Consulting*, 688 F. Supp. 2d at 611-12 (citing Rule 37(b)(2)(A)); *Super Future Equities, Inc. v. Wells Fargo Bank Minnesota, N.A.*, No. 3:06-CV-0271-B, 2008 WL 3261095, *12 (N.D. Tex. Aug. 8, 2008).

[23] *See, e.g.*, *Super Future Equities, Inc. v. Wells Fargo Bank Minnesota, N.A.*, No. 3:06-CV-0271-B, 2008 WL 3261095, *13-14 (N.D. Tex. Aug. 8, 2008) (concluding that an "adverse inference instruction" was appropriate, recommending that the court inform the jury of the party's spoliation and that the jury may consider the spoliation as part of their deliberation on the spoliating party's claims, and awarding attorney's fees); *Tandycrafts, Inc. v. Bublitz*, No. 3:97-CV-1074-T, 2002 WL 324290, *1, 3-4 (N.D. Tex. Feb. 27, 2002) (after ordering a trial on damages only, ruling that the spoliating party would only be permitted to cross-examine the opponent's witnesses, barred from producing any evidence of its own, and permitted to use for impeachment only documents produced in discovery, and awarding attorney's fees); *Escobar v. City of Houston*, No. 04-1945, 2007 WL 2900581, *17 (S.D. Tex. Sept. 29, 2007) ("A sanction may include an instruction that if a party that destroys or loses evidence subject to a preservation obligation, the fact finder may presume that the evidence was prejudicial. *FDIC v. Hurwitz*, 384 F. Supp. 2d 1039, 1099 (S.D. Tex. 2005).") (citing *Nation-Wide Check Corp. v. Forest Hills Distribs, Inc.*, 692 F.2d 214, 217-18 (1st Cir. 1982)); *Rimkus Consulting*, 688 F. Supp. 2d at 618-20 & n.20 (setting out the jury charge provided to a jury as a spoliation sanction).

## IV.  The Acts of Spoliation and Bad Discovery Conduct

**A.**     **Muthee hit Don Ashton, fled the scene, and deprived the Kansas Highway Patrol of the opportunity to examine the tractor-trailer on August 11, 2007.**

Just after midnight on August 11, 2007, while driving a 1988 Chevrolet Camaro east on Fir Road, Jacob Valek ran a stop sign at the intersection of US-81 and hit a 2006 General Motors Hummer H3.[24]  Kelly Ashton and her husband, Don, and their friend, Will Helton, were traveling south on US-81 in the Hummer and were hauling an open-bed trailer with two motorcycles.[25] The Hummer rolled across US-81's median and northbound lanes.[26]  It came to a rest just outside the fog line on the far east side of the northbound lanes.[27]

On August 10, 2007, George Muthee set out from Muskogee, Oklahoma and drove a 2006 Volvo tractor, with a trailer, north on US-81 in northern Kansas.[28]  Moments after the Valek-Ashton impact on August 11, Muthee approached and entered the debris field.[29]   He was driving fast, hit debris, hit something large and metallic (probably one of the H3's wheels[30]) and hit Don Ashton.[31]   Muthee testified that he felt a "jolt."[32]  He drove forward some distance,

---

[24] *See, e.g.*, Kansas Highway Patrol, Motor Vehicle Accident Report, 3, Tab 2; Memorandum Opinion & Order, 1-3 (filed Sept. 20, 2010) (doc 80).

[25] *See, e.g.*, Helton's Depo. at 43:13-44:17, 49:8-51:15, Tab 35; Photographs, Tab 4 (showing vehicles, motorcycles, and the trailer).

[26] *See, e.g.*, Photo, Tab 4.

[27] *See, e.g.*, Photo, Tab 4.

[28] *See, e.g.*, Knight Transportation Services, Unit Locations Display, KTI 557, Tab 3 (showing Muthee's driving locations); Kansas Highway Patrol, Motor Vehicle Accident Report, 3, Tab 2 (describing the incident and roads).

[29] *See, e.g.*, Helton's Depo. at 167:2-24, Tab 35; Sant's Depo. at 179:10-180:16, Tab 34.

[30] *See, e.g.*, Photo, Tab  (showing white imprint); Robert S. McKinzie, Report, 9, Tab 13 ("Also observed in this area in a wheel rim and tire sidewall impression on the pavement.  Three wheels are visible in an aerial photograph.").

[31] *See, e.g.*, Helton's Depo. at 167:1-24, 170:1-172:25, 174:3-176:6, Tab 35.

[32] *See, e.g.*, Muthee's Depo. at 119:19-122:12, Tab 38.

**Plaintiff Ashton's Motion Regarding Spoliation**                                                    **– Page 6**

slowed down, and then drove off.[33]  According to Helton, he drove forward, "realized and left."[34]  He did not stay at the scene, and he did not report the events to the police.[35]  As a result, the Kansas Highway Patrol—who thoroughly examined Billy and Deborah Chicks' truck on August 11[36]—did not examine the tractor or trailer that Muthee was driving on August 11.  Because a 7'x3' piece of red fairing remained at the scene, the Kansas Highway Patrol was able to track the vehicle to Knight Transportation, who identified Muthee as the driver.[37]

**B.      Muthee continued driving to Sparks, Nevada, and changed the tractor's two front steer tires there on August 13.**

Instead of stopping at the scene on August 11 and allowing the police to examine his tractor trailer, Muthee drove the approximately 1,400 miles to Sparks, Nevada.[38]  Driving wears the tires.

Moreover, Muthee had the tractor's two front steer tires changed at an outside vendor's shop in Sparks.[39]  Knight Transportation states that it doesn't have the two front steer tires

---

[33] *See, e.g.*, Helton's Depo. at 170:5-24, 160:7-12, Tab 35.

[34] *See, e.g.*, Helton's Depo. at 159:1-160:12, Tab 35.

[35] *See, e.g.*, Helton's Depo. at 159:8-160:12, Tab 35; Muthee's Depo. at 119:19-122:24, Tab 38.

[36] *See, e.g.*, Declaration of Billy Chick, ¶ 4, Tab 8 ("Shortly afterwards, emergency personnel and Kansas Highway Patrol officers showed up.  I stayed on the scene for 9 or 10 hours before the officers released me.  The Kansas Highway Patrol officers thoroughly searched my truck for blood and flesh.  They determined that I did not hit the man who was killed at the scene.").

[37] *See, e.g.*, Helton's Depo. at 168:1-24, Tab 35; Trooper Scott Walker's Affidavit, 1-2, Tab 6; Certificate of Origin, Tab 7.

[38] *See, e.g.*, Knight Transportation Services, Unit Locations Display, KTI 557 (showing Muthee starting out from Muskogee on August 10, 2007), KTI 560 (showing Muthee in Salina, Kansas and crossing to Beatrice, Nebraska from August 10-11), KTI 568 (showing Muthee in Sparks, Nevada on August 13), Tab 3.

[39] *See, e.g.*, Defendant Knight Transportation, Inc.'s 1st Supplemental Responses and Objections to Plaintiffs' First Set of Interrogatories, response to no. 5 (served Dec. 1, 2009), Tab 9 ("Defendant is aware that the two front steer tires were replaced on August 13, 2007 in Sparks, Nevada); Repair Records, KTI 14, 350-51, 604-07, Tab 10.

because the vendor wasn't under its control.[40]  But Knight Transportation has a repair facility in

Sparks.[41]

**C.    Robert Steve McKinzie scraped what he though was blood or tissue from the tractor on August 25.**

Robert Steve McKinzie is a former Kansas Highway Patrol officer and an accident

reconstructionist based in Stillwell, Kansas.[42]  On August 25, 2007, he examined the 2006 Volvo

tractor, which Muthee was driving on August 11, at one of Knight Transportation's facilities in

California.[43]  He scraped what he thought was blood or tissue from the tractor.[44]  He knew that

the Kansas Highway Patrol was investigating the events of August 11 at the time.[45]

**D.    Ryan Rezzelle conducted destructive testing in September.**

Ryan Rezzelle is a crime scene investigator in either the Kansas City Police Department

(Missouri) or the Johnson County Sheriff's Office Criminalistics Laboratory (Kansas).[46]  On

---

[40] *See, e.g.*, Defendant Knight Transportation, Inc.'s Responses and Objections to Plaintiffs' Third Set of Interrogatories, response to no. 11 (served Apr. 28, 2010), Tab 12 ("George Muthee had the tires replaced in Sparks, NV and said tires are believed to be either destroyed, recycled, or sold pursuant to the TDS facility procedure which is not under the control or direction of this Defendant.  Knight does not retain tires replaced at outside vendors.").

[41] *See* Map from Knight Transportation's website, Tab 17; http://www.knighttrans.com/about/locations.

[42] *See, e.g.*, Affidavit of Robert S. McKinzie, 1-2; Excerpt from McKinzie's Resume, Tab 13.

[43] *See, e.g.*, Defendant Knight Transportation, Inc.'s Responses and Objections to Plaintiffs' Third Set of Interrogatories, response to no. 10 (served Apr. 28, 2010), Tab 12 ("Steve McKinzie of McKinzie & Associates, LLC examined the Knight Tractor on or about August 25, 2007."); Robert S. McKinzie's Report, 13, Tab 13 ("The Volvo tractor was examined in California at a Knight Transportation facility.  See figure 11.  A thorough examination of the vehicle exterior and undercarriage revealed no trace evidence of contacting a body.  Samples of an unknown contaminant on the aft portion of the fuel tank fiberglass cowling were examined and not consistent with blood.  See Exhibit D.").

[44] *See* Robert S. McKinzie's Report, 13, Tab 13 ("The Volvo tractor was examined in California at a Knight Transportation facility.  * * *  Samples of an unknown contaminant on the aft portion of the fuel tank fiberglass cowling were examined and not consistent with blood.  See Exhibit D.")

[45] *See, e.g.*, Emails between R.S. McKinzie and Trooper Kip Ballinger, Tab 18.

[46] *See, e.g.*, Ryan Rezzelle, MFS, CCSA, Kansas City Police Criminal Laboratory, Crime Scene Investigations:  An Introduction to Evidence for First Responders, Tab 15; Allen Hamm & Ryan M. Rezzelle, MFS, CSCSA, Johnson County Sheriff's Office Ciminalistics Laboratory, The Forensic DNA Testing Program:  Improving Efficiency & Effectiveness, Tab 16.

September 13, 2007, Rezzelle took six samples from McKinzie and purportedly tested them for blood.[47]  Because he worked with McKinzie, Rezzelle knew or should have known that the Kansas Highway Patrol was investigating the events of the crashes at Fir Road and US-81 on August 11.[48]  Muthee and Knight Transportation did not list Rezzelle on their Rule 26 disclosures as a retained, or any other kind, of expert.[49]  They did not list him as a person with relevant knowledge.[50]

### E.    Other Discovery Misconduct

#### 1.    McKinzie's August 25, 2007 Inspection of the Volvo Tractor

A party must initially disclose, at least by description, a copy of all documents and things that the party may use to support its claims or defenses.[51]  Here, Knight Transportation and Muthee sent Robert Steve McKinzie to examine the 2006 Volvo tractor, which Muthee drove on August 11, 2007, on August 25, *2007*.[52]  Knight Transportation and Muthee designated McKinzie as an expert and, thus, planned to use his testimony and information to support its

---

[47] *See, e.g.*, Ryan Rezzelle, Report, 1, Tab 14.  This "report" is internal Ex B to Robert S. McKinzie's Report.

[48] *See, e.g.*, Ryan Rezzelle, Report, 1, Tab 14 (stating that he picked up the samples from Robert S. McKinzie & Associates, LLC).

[49] *See, e.g.*, Defendant Knight Transportation, Inc. and George M. Muthee's Initial Rule 26 Disclosures Subject to their Motion to Dismiss or in the Alternative Transfer Venue, 1-3, Tab 19; Defendants' Rule 26(a)(2) Disclosures, 1-3, Tab 20 (listing McKinzie, but not Rezzelle).

[50] *See* Defendant Knight Transportation, Inc. and George M. Muthee's Initial Rule 26 Disclosures Subject to their Motion to Dismiss or in the Alternative Transfer Venue, 1-3, Tab 19.

[51] *See* Fed. R. Civ. P. 26(a)(1)(A)(ii).  Also, this Court repealed local rule 26.1, which allowed parties not to make initial disclosures, on December 1, 2000.  http://www.txnd.uscourts.gov/rules/localrules/civilrules26_54.html#261

[52] *See, e.g.*, ., Defendant Knight Transportation, Inc.'s Responses and Objections to Plaintiffs' Third Set of Interrogatories, response to no. 10 (served Apr. 28, 2010), Tab 12 ("Steve McKinzie of McKinzie & Associates, LLC examined the Knight Tractor on or about August 25, 2007."); Robert S. McKinzie's Report, 13, Tab 13 ("The Volvo tractor was examined in California at a Knight Transportation facility.  See figure 11.  A thorough examination of the vehicle exterior and undercarriage revealed no trace evidence of contacting a body.  Samples of an unknown contaminant on the aft portion of the fuel tank fiberglass cowling were examined and not consistent with blood.  See Exhibit D.").

defenses.[53]  Brett Sant—Knight Transportation's Safety Director[54]—knew that McKinzie had

been sent to investigate Muthee's conduct.[55]  Nonetheless, Knight Transportation and Muthee

intentionally concealed McKinzie's existence and his August 2007 inspection in its initial

Rule 26 disclosures, which it served May 28, 2009.[56]

Also, when McKinzie first provided his report on March 19, 2010, he merely referred to

"a thorough examination" and a "post crash inspection" of the Volvo at pages 13 at 19 of his

report.[57]  He didn't state the facts that (1) *he* conducted the examination and (2) he conducted it

about two weeks after the crash on August 25, 2007.  Likewise, Knight Transportation and

Muthee didn't volunteer this information.  Ashton had to obtain it by interrogatory.[58]

In addition, Knight Transportation and Muthee's concealment of McKinzie's August

2007 inspection of the Volvo lasted until it answered Ashton's interrogatory on April 28, 2010,

which means that they concealed it until after Ashton served her Rule 26(a)(2) expert reports on

February 17, 2010.[59]

Knight Transportation's and Muthee's motive in concealing McKinzie's August 2007

inspection was not only to conceal the relevant fact that they had already inspected the tractor

---

[53] *See* Defendants' Rule 26(a)(2) Disclosures, 1 (served Mar. 19, 2010), Tab 20.

[54] *See* Sant's Depo. at 7:1 (stating that it was June 8, 2010), 7:2-4 (identifying Sant), 7:21-24 (stating that he is Knight's Safety Director), Tab 34.

[55] *See* Sant's Depo. at at 131:14-132:5, 142:2-143:18, 250:14-251:3, Tab 34.

[56] *See* Defendant Knight Transportation, Inc. and George M. Muthee's Initial Rule 26 Disclosures Subject to Their Motion to Dismiss or in the Alternative Transfer Venue (served May 28, 2009), Tab 19 (not listing McKinzie or identifying his inspection).

[57] *See* Excerpts of Robert S. McKinzie's Report, 9, 13, Tab 13.

[58] *See* Defendant Knight Transportation, Inc.'s Responses and Objections to Plaintiffs' Third Set of Interrogatories, response to no. 10 (served Apr. 28, 2010), Tab 12 ("Steve McKinzie of McKinzie & Associates, LLC examined the Knight Tractor on or about August 25, 2007.").

[59] *See* Scheduling Order, ¶ II(2)(a) (filed June 5, 2009) (doc 14) (setting a Feb. 17, 2010 deadline for Ashton to served her expert reports).

and evidence that the company appreciated the gravity of the events on August 11, 2007, in that month, but also to cover up or obscure their intentional spoliation of evidence; that is, McKinzie's scraping what he thought was blood or tissue from the tractor.

### 2.    Driver Violation Inquiry

In her RFP no. 24, Kelly Ashton asked Knight Transportation to produce all documents (and "documents" included electronic or magnetic data[60]) relating to actual or alleged violations of law by George Muthee, including notices and warnings for violating any federal or state law related to driving.[61]  In RFP no. 25, she asked for documents relating to any actual or alleged violation by Muthee of federal regulations related to driving while ill or fatigued.[62]  And in no. 26, she asked for documents related to his duty status from June 11 to September 11, 2007.[63]

First, Knight Transportation withheld key information for months.  Although Knight Transportation served responses on September 9, 2009 and stated "see the documents attached hereto," this response was inaccurate.  Knight Transportation waited until *June 7, 2010* to produce a copy of Knight Transportation Services, Driver Violation Inquiry (Tab 23), which is a printout of a computer screen that showed that Muthee was driving in excess of federal hours-of-service regulations (*see* 49 C.F.R. § 395.3 (maximum hours), § 395.8 (record of duty status), § 395.15 (automatic on-board recording devices)) in the days and hours leading up to the

---

[60] *See* Plaintiff Kelly Ashton's First Requests for Production to Defendant Knight Transportation, Inc., definition no. 8, at 4 (served July 16, 2009), Tab 21 (invoking Rule 34(a)(1)(A) and 34(b)(2)(D) & (E)).

[61] *See* Defendant Knight Transportation, Inc.'s Responses & Objections to Plaintiffs' First Set of Requests for Production, request no. 24 (served Sept. 1, 2009), Tab 22.

[62] *See* Defendant Knight Transportation, Inc.'s Responses & Objections to Plaintiffs' First Set of Requests for Production, request no. 25 (served Sept. 1, 2009), Tab 22.

[63] *See* Defendant Knight Transportation, Inc.'s Responses & Objections to Plaintiffs' First Set of Requests for Production, request no. 26 (served Sept. 1, 2009), Tab 22.

incident on August 11, 2007.[64]  It waited until the *day before* Ashton took the deposition of Brett

Sant, Knight Transportation's Safety Director, to produce evidence that the company knew that

Muthee was driving in violation of federal law.[65]  Moreover, Knight Transportation's misconduct

deprived Ashton of this information in time to use it for her February 17, 2010 deadline to

produce expert reports,[66] and Dave Stopper—one of Ashton's experts—evaluated the very

question of Knight Transportation's monitoring of Muthee's hours of service.[67]  Knight

Transportation's attorney's explanation was that the client provided the documents "late this

[June 7] afternoon."[68]

Second, Knight Transportation inaccurately described its production to the Court on

December 3, 2009.  Ashton served her RFP nos. 24–26 on July 16, 2009, and Knight

Transportation responded on September 1, 2009.[69]  On September 23, Ashton wrote Knight

Transportation a six-page letter to confer on discovery questions.[70]  Ashton asked whether

Knight Transportation was withholding any documents responsive to request nos. 24 and 25.  On

---

[64] *See* Fax from Daniel Karp, an attorney for Knight Transportation, to Michael Pezzulli, an attorney for Kelly Ashton, 1 (June 7, 2010) (forwarding the "Driver Violation Inquiry," KTI 1309-1321 at "16:58" or 4:58 p.m.), Tab 23; Email from Daniel Karp, an attorney for Knight Transportation, to Michael Pezzulli, an attorney for Kelly Ashton, 1 (June 7, 2010) (forwarding a PDF copy of the "Driver Violation Inquiry," KTI 1309-1321 at 5:58 p.m.), Tab 24.

[65] *See* Email from Daniel Karp, an attorney for Knight Transportation, to Michael Pezzulli, an attorney for Kelly Ashton, 1 (June 7, 2010) (forwarding the "Driver Violation Inquiry," KTI 1309-1321), Tab 24; Sant's Depo. at 7:1 (stating that it was June 8, 2010), 7:2-4 (identifying Sant), 7:21-24 (stating that he is Knight's Safety Director), 10:25-12:6 (briefly discussing the document), Tab 34.

[66] *See* Scheduling Order, ¶ II(2)(a) (filed June 5, 2009) (doc 14).

[67] *See, e.g.*, Excerpts from Dave Stopper's Report, 17-22, Tab 26.

[68] Email from Daniel Karp, an attorney for Knight Transportation, to Michael Pezzulli, an attorney for Kelly Ashton, 1 (June 7, 2010), Tab 24  ("The documents themselves are the 'source' as you request.  We just received these late this afternoon and have forwarded immediately.").

[69] *See* Defendant Knight Transportation, Inc.'s Responses & Objections to Plaintiffs' First Set of Requests for Production, request no. 24 (served Sept. 1, 2009), Tab  22.

[70] *See* Letter from Chris Barnes, one of Ashton's lawyers, to Daniel Karp, one of Knight Transportation's lawyers, 1-6 (Sept. 23, 2009), Tab 27.

November 18, Ashton filed a motion to compel various documents, including ones responsive to these requests.[71]  The Court required the parties to confer again and file a joint status report.[72]  In the report, Knight Transportation wrote that it had fully responded to request nos. 24 and 25 and that it wasn't withholding any documents.[73]  Given that Knight Transportation actually produced the Driver Violation Inquiry for the first time in June 2010, it inaccurately described its production to the Court on December 3, 2009.

Third, Knight Transportation produced, on June 7, 2010, an illegible and incomprehensible version of the Driver Violation Inquiry, Tab 23 (KTI 1309–1321).  As the Court will see, no one could read this document and decipher that Knight Transportation knew that Muthee was driving in excess of federal hours-of-service limitations.  When Ashton confronted the company with this fact, Knight Transportation produced a more legible copy, *see* Tab  25 (KTI 1322–23), during Sant's deposition, and the Safety Director testified about this version and how it showed that Muthee was driving while fatigued.[74]

### 3.    QUALCOMM or Email-Like Messages

Muthee's tractor was equipped with QUALCOMM equipment in August 2007.[75]  In its initial production of documents, KTI 1–639, Knight Transportation produced KTI 578–83, which are email-like messages between Muthee and Knight Transportation for August 13–17, 2007.[76]

---

[71] *See* Plaintiff's Motion to Compel Discovery from Defendants Knight Transportation, Inc. and George Muthee and Brief in Support, 6-7, 12 (filed Nov. 18, 2009) (doc 39).

[72] *See* Order, 1-2 (filed Nov. 20, 2009) (doc 42).

[73] *See* Joint Status Report Under the Court's November 20, 2009 Order (Regarding Plaintiff's Motion to Compel), 6 (filed Dec. 3, 2009) (doc 43).

[74] *See, e.g.*, Sant's Depo. at 185:18-1-218:2, Tab 34.

[75] *See* Quad K. Leasing, Inc., Repair Order Detail Report, KTI 67-70, Tab 28 (showing that the tractor had QUALCOMM equipment).

[76] *See* Knight Transportation, Message Directors, Vehicle Mailbox, KTI 578-583, Tab 29.

**Plaintiff Ashton's Motion Regarding Spoliation**                                    **– Page 13**

These communications discussed Muthee's driving hours.  In the context of talking about its response to RFP no. 10, Ashton asked about these documents and requested the communications for August 10–27, 2007.[77]  In the joint status report, Knight Transportation agreed that Ashton was entitled to these communications and that "Ashton may need to question a corporate representative about additional communications, if any."[78]

On June 30, 2010, Knight Transportation produced a document, Tab 29, which purported to be the QUALCOMM messages in Excel form for August 8–13, 2007.[79]  But there are several problems with this production.

First, as a comparison of this document, Tab 29, with the ones at KTI 578–83, Tab 30, show, Knight Transportation did not produce these communications in their normal format. Instead, it created a new Excel spreadsheet for the communications, which may obscure any edits or omissions.

Second, as the Court can see from the document at Tab 30, the pages must be assembled into a new whole in order to get comprehensible information.  Ashton will provide an assembled copy to the Court in a courtesy copy.  Noneless, this format obscured the document's meaning.

Third, Knight Transportation listed the dates of the communications in this format under the column "Message date":  "200/72/20," "200/72/21," "200/72/22," and "200/72/23,"

---

[77] *See* Letter from Chris Barnes, one of Ashton's lawyers, to Daniel Karp, one of Knight Transportation's lawyers, 2, item no. 4 (Sept. 23, 2009), Tab 27.

[78] *See* Joint Status Report Under the Court's November 20, 2009 Order (Regarding Plaintiff's Motion to Compel), 5 (filed Dec. 3, 2009) (doc 43).

[79] *See* Email from Dan Karp, one of Knight Transportation's lawyers, to Michael Pezzulli, one of Ashton's lawyers, 1-2 (June 30, 2010, 5:25 p.m.), Tab 30 ("I have also attached the Quallcomm messages in Excel form for August 8th through 13th.").

"200/72/24," and "200/72/25."  So Ashton asked for the key to this code,[80] and it stated that "200/72/20" would be "August 8" and that "19=7," "20-8," and "21= August 9."[81]  This "coding" of the dates would obscure the exhibit's meaning to the jury.

Fourth, if "21" means August 9, 2007, then "22" means August 10 and "23" means August 11 (recall, the three-vehicle incident occurred just after midnight on August 11, 2007[82]) and the "list" produced by Knight Transportation contains no communications between Muthee from 10:55:53 on August 10 to 6:46:40 on August 11.[83]  Again, Knight Transportation assembled this data into a separate Excel spreadsheet.  It didn't produce it in its original form like it did KTI 578–583, Tab 29.  It seems doubtful that there were no communications between Muthee and Knight Transportation during those hours, especially since Muthee lost a 7'x3' piece of his truck at the crash site.  This absence of a record of QUALCOMM messages in the hours surrounding the crash is more suspicious in light of the missing SIM card from Muthee's cell phone.  The new "data" also suddenly contains self-serving communications, such as "George, you also drove entirely too far over your hours.  This is not good.  You know the hours of service, we must maintain safe and legal driving.  Both you and the company have too much to lose by driving outside of the hours of service regulations.  You need to get a 10 hr break in at the customer where you are at."

---

[80] *See* Email from Michael Pezzulli to Dan Karp, 1 (June 30, 2010, 5:47 p.m.), Tab 30 ("Can you translate Message date '200/7/20'?").

[81] Email from Dan Karp to Michael Pezzulli, 1 (June 30, 2010, 5:45 p.m.), Tab 30.

[82] *See* Kansas Highway Patrol, State of Kansas Motor Vehicle Accident Report, 1, Tab 2 ("Time occurred:  00:05" "Date of Accident:  08/11/2007").

[83] *See* Email from Michael Pezzulli to Dan Karp, 1 (June 30, 2010, 6:09 p.m.), Tab 30 ("If your translation is correct, the QuallComm data on the 10th of August to 6:46a on the 11th is missing.  So, for over an hour before the crash to over 6 hours after the crash there is no QuallComm data?).

## V.  Sanctions or Adverse-Inference Jury Instructions

**A.    The Court should strike Muthee's and Knight Transportation's
pleadings or defenses.**

### 1.    Leaving the Scene; Steer Tires

Muthee personally committed the first two acts of spoliation—fleeing the scene and, thus, depriving the Kansas Highway Patrol of a chance to inspect the Volvo tractor (as they did the Chicks' 18-wheeler) and continuing to drive about 1,400 miles from Kansas to Sparks, Nevada, and having the tractor's two front steer tires replaced.  He meets the standards for a sanction for spoliation based on these two acts.

First, he had a duty to preserve evidence.  A duty arises when one has notice that evidence may be relevant to future litigation.  Here, Muthee approached a wreckage debris field while driving a commercial truck.  Although it was night, the Hummer's flashers were on.[84]  The fact that Billy and Deborah Chick saw the same wreckage and pulled over and stopped shows that a driver could see the debris field.  Moreover, Muthee hit debris and a large piece of metal.  Helton said the impact sounded like an explosion.[85]  The 2006 Volvo left a 7' x 3' piece of fairing at the scene.  Helton perceived Muthee hit Don.[86]  Muthee admits that he felt a jolt.[87]  Muthee therefore had a duty to stop and report the events.[88]

---

[84] *See* Warren's Depo. at 4:19-20, 9:19-10:9, 37:1-9, 109:5-15, Tab 35.

[85] *See* Helton's Depo. at 167:2-24, Tab  35.

[86] *See* Helton's Depo. at 167:2-16, 169:7-17, Tab 35.

[87] *See, e.g.*, Muthee's Depo. at 119:19-120:1, 130:5-131:21, Tab  38.

[88] *See* 49 C.F.R. § 392.2 (requiring a commercial driver to operate his or her vehicle in accordance with the laws, ordinances, and regulations of the jurisdiction in which it is being operated); Kan. Stat. Ann. §§ 8-1602 (requiring a driver in an accident involving a death or great bodily harm to stop at the scene and fulfill section 8-1604); 8-1603 (requiring a driver in an accident resulting only in damage to another vehicle or other property to stop at the scene and fulfill section 8-1604); 8-1604 (describing a driver's duty to provide information after an accident); 8-1605 (same as 8-1603 for accidents involving unattended vehicles).

Second, Muthee acted with bad faith.  Despite driving into a debris field with a Hummer's flashing lights on, hitting debris, creating a sound like an explosion, feeling a "jolt," and leaving a 7'x3' piece of his tractor at the scene, Muthee didn't stop and drove on.  He also drove approximately 1,400 miles to Sparks, Nevada, in the next two days and had the two front steer tires replaced at an outside vendor's shop, despite the fact that Knight Transportation has a facility in the same town.  Not only would driving on them and removing them destroy any evidence on them, but, as Will Helton, who was a Firestone store manager for several years pointed out,[89] a driver might want to change the steer tires so that the new tires' tread pattern wouldn't match the tread pattern on the road.[90]  Moreover, he falsified his log—in violation of federal regulations[91]—to show that he was asleep in his berth, when he was actually driving north on US-81 in northern Kansas.[92]  Not only did he remove evidence in the form of his tractor, tires, and whatever was on them, from the scene, but he also avoided a mandatory drug test, which federal regulations require for a driver involved in a fatality occurrence.[93]  This is evidence of consciousness of wrongdoing and, therefore, of bad faith.[94]

Third, Muthee's conduct deprived Kelly Ashton and the authorities of relevant evidence.  By leaving the scene, Muthee prevented the Kansas Highway Patrol from examining his tractor

---

[89] *See* Helton's Depo. at 7:12-13, 8:22-9:13, 11:10-15, 12:1-13, 23:21-24:5, Tab 35.

[90] *See* Helton's Depo. at 178:17-180:22, Tab 35.

[91] *See* 49 C.F.R. § 395.8.

[92] *Compare* Driver's Daily Log, KTI 553-554, Tab  31 (showing that Muthee recorded that he was asleep in his berth during the night of August 10-11, 2007) *with* Knight Transportation Services, Unit Locations Display, KTI 557-62, Tab 3 (showing that Muthee was driving in northern Kansas at the time); Muthee's Depo. at 243:7 -246:24, Tab 38.

[93] *See* 49 C.F.R. § 382.301.

[94] *See Allen v. United States*, 164 U.S. 492, 497-98, 17 S. Ct. 154, 156 (1896); *United States v. Murphy*, 996 F.2d 94, 96-97 (5th Cir. 1993); *United States v. Veltre*, 591 F.2d 347, 350 (5th Cir. 1979).

trailer for evidence related to hitting Don Ashton.  For example, the troopers thoroughly examined the tractor and trailer of Billy and Deborah Chick for evidence that their truck had hit Don.  Again, Kelly Ashton disagrees that she has a duty to show that Don did not suffer a fatal injury in the Valek impact or that he would have been alive on August 12 or 13 but for Muthee's conduct.[95]  But Knight Transportation and Muthee argue precisely this.[96]  If they are correct, however, then Muthee intentionally destroyed evidence relevant to this very burden.

Moreover, no authorities were able to perform the mandatory drug testing on Muthee.  This fact, combined with his falsification of his log and the fact that he had driven in excess of the federal hours-of-service limits (*see* 49 C.F.R. § 395.3),[97] supports the conclusion that he may have been fatigued and taking a drug or medication to stay awake.

### 2.    Scraping the Volvo Tractor for Evidence

Brent Sant—Knight Transportation's Safety Director[98]—testified that various attorneys, whether with Fee, Smith Sharp, Vitullo, or Lee Baty's office (Lee Baty, if anyone, conducted an investigation into Muthee's conduct[99]), hired Robert Steve McKinzie to investigate the

---

[95] *See, e.g.*, Plaintiff Kelly Ashton's Response to Defendants' Objections to Plaintiffs' Summary-Judgment Evidence (doc 58) and Brief in Support, 6-8, 12-15 (filed Aug. 4, 2010) (doc 60); Plaintiff Kelly Ashton's Motion to Strike Exhibits to the Summary-Judgment Reply of Defendants Knight Transportation and George Muthee (doc 58) and Brief in Support, 2-6 (filed Aug. 4, 2010).

[96] *See, e.g.*, Knight Transportation's and Muthee's Parts of the Proposed Joint Pretrial Order, 7, 10-11, 13-14 (filed Sept. 10, 2010); Memorandum Opinion & Order, 5-7 (filed Sept. 20, 2010) (doc 80).

[97] *See* Brett Sant's Depo. at 186:5-188:8, 188:10-190:14, 190:9-191:4, 193:20-194:17, 194:15-195:3, 195:17-196:9, 197:1-199:25, 195:17-196:9, 200:1-11, 213:14-22, Tab 34 (testifying that Muthee had been driving 19 hours of the previous 24 hours by 8:30 a.m., CST on August 9, 2007); Knight Transportation Services, Driver Violation Inquiry, KTI 1322-23, Tab  23; Kansas Highway Patrol, Motor Vehicle Accident Report, 1 ("date of accident 08/11/2007," "time occurred 00:05").  This refers to the collision between Valek's Camaro and the Ashton's Hummer.  Muthee hit Don shortly afterwards.  *See* Helton's Depo. at 44:4-47:17, 50:9-52:23, 65:4-19, 96:2-13, 121:21-123:20, 164:13-167:16, Tab 35.  Kelly Ashton more fully explains the evidence on the point that Muthee was driving in excess of federal hours in Plaintiff Kelly Ashton's Response to Defendants' Motion for Summary Judgment, 11-13 (filed July 1, 2010) (doc 56) (fact no. 11(b)).

[98] *See* Sant's Depo. at 7:2, 21-24, Tab 34.

[99] *See* Sant's Depo. at 142:2-11, Tab 34.

**Plaintiff Ashton's Motion Regarding Spoliation**                                          **– Page 18**

incident.[100]  On August 25, McKinzie scraped what he thought were blood or tissue samples from the 2006 Volvo tractor, which Muthee was driving on August 11.  Given that McKinzie was an agent for Muthee and Knight Transportation, they meet the sanction standards for spoliation on the basis of this conduct.

First, Muthee knew of the need to preserve evidence because he was involved in the events of August 11 as discussed.  Given that Muthee's tractor was equipped with QUALCOMM equipment, which allowed email-like communications with Knight Transportation,[101] Knight Transportation also knew of the need to preserve evidence on August 11.  Moreover, photos show that Muthee had a cell phone,[102] which also supports a finding that the company talked to Muthee on August 11.  Also, Tire Distribution Systems—who changed Muthee's two front steer tires—sent an August 13 invoice to Knight Transportation, which stated "inside shoulders worn RH [right-hand] side damage from step/accident."[103]  As the Court can see in the photo at Tab 5, the "step" is part of the fairing, which Muthee left at the scene.  Knight Transportation and Muthee, thus, subjectively knew of the need to preserve evidence by August 13.  Also, they sent McKinzie, their agent, to California to inspect the tractor on August 25.  In turn, McKinzie knew about the Kansas authorities' investigation and, as a former police officer, knew that he had a duty not to tamper with evidence of a possible crime.[104]

---

[100] *See* Sant's Depo. at 131:14-132:5, 142:2-143:18, 250:14-251:3, Tab 34.

[101] *See* Knight Transportation, Message Director, Vehicle Mailbox, KTI 578-584, Tab 29.

[102] *See* Photos, Tab 32.

[103] TDS Invoice, Tab 11.

[104] *See* Ballinger's Depo. at 109:22-111:20, Tab 37.

Second, McKinzie, Knight Transportation, and Muthee acted with bad faith. Despite his knowledge that it's improper or a crime to tamper with evidence, McKinzie scraped what he believed could have been blood or tissue from the tractor and had the material destructively tested.

Moreover, Knight Transportation and Muthee withheld the QUALCOMM messages, for dates before August 13, in discovery until June 2010 and they never produced the messages for the hours surrounding the crash. And by August 25, the SIM card from Muthee's cell phone had been removed.[105] Thus, Knight Transportation and Muthee never listed the cell phone's contents or related records as a relevant record under Rule 26 or produced these materials in response to Ashton's Rule 34 requests.

Kansas Trooper Kip Ballinger described Knight Transportation's conduct as obstructing his investigation.[106] Rather than permitting the Kansas authorities to inspect the tractor on the same terms and at the same time as McKinzie, Knight Transportation forced the Kansas police to work with the Ontario, California police to secure a search warrant.[107]

Third, their conduct deprived Ashton and the authorities of relevant evidence. Knight Transportation and Muthee argue that Ashton must prove that "Mr. Muthee's vehicle struck

---

[105] *See* Photos, Tab 32. Apparently, McKinzie took these photos in the cab of the 2006 Volvo tractor during his August 2007 inspection, and Knight Transportation first produced them in April 2010, despite its Rule 26 obligation to produce or identify them in its initial disclosures in early 2009.

[106] *See* Email from Trooper Kip Ballinger, to K. Calkins, Republic County Attorney's Office, 1-2 (Sept. 30, 2009), Tab  (stating that Knight Transportation was in violation of 49 C.F.R. § 390.15(a), which requires a trucking company to make all records and information pertaining to an accident available to a state law-enforcement agency, by withholding statements of witnesses, denying an interview with Muthee, and failing to provide  "true and correct response to any question of the inquiry") ("In other words, they have stymied our investigation all along."); Ballinger's Depo. at 7:13-15, 8:2-21, 120:4-121:12, Tab 37 (proving up his email correspondence as Ex 16 to his deposition).

[107] *See* Ontario, California, Police Department Records, Tab 33.

Mr. Ashton"[108] or "made contact with Ashton."[109]  Evidence of blood or tissue, which McKinzie

admittedly scraped away, would be relevant to this defense contention.  Likewise, Knight

Transportation's refusal to cooperate with the authorities in investigating the incident also likely

deprived the authorities and Ashton of this type of evidence.  The email-like communications

and Muthee's cell phone likely contained evidence of the timing, nature, and extent of Knight

Transportation's knowledge of the events (although admittedly it's clear that Knight

Transportation knew enough to arrange for criminal-defense lawyers to represent Muthee in

Kansas and to hire and send McKinzie to California by August 25).  But it's possible that these

materials would also show that Muthee knew that he hit a person on August 11.

### 3.    Testing the Ostensible Samples

On page 13 of his report, McKinzie states that "Samples of an unknown contaminant on

the aft portion of the fuel tank fiberglas cowling were examined and not consistent with blood.

See Exhibit D."[110]  Exhibit D to his report is a two-page letter or report from Ryan Rezzelle,

which purports to report on the results of tests on six samples.[111]  Apparently, Knight

Transportation and Muthee want to offer the report or results as evidence that there was no

"blood" or "human blood" found.[112]  But Knight Transportation and Muthee didn't announce

McKinzie's August 25, 2007 examination or sample scraping or Rezzelle's ostensible testing.

They didn't let the police, who were investigating the crash, participate or monitor.  And

---

[108] Defendants' Motion for Summary Judgment and Brief in Support, 5 (filed May 24, 2010) (doc 53).

[109] *Id.* at 7; *see id.* at 8 ("[T]here is simply no competent evidence of any contact whatsoever between Muthee's vehicle and Ashton's body."); *id.* at 11 ("There is no direct evidence that Muthee's vehicle struck Ashton . . . .")

[110] Robert Steve McKinzie, Report, 13, Tab 13.

[111] *See* Ryan Rezzelle, Report, 1-2, Tab 14 .

[112] *See id.* ("Each sample was subsequently tested using a Bayer Hemastix presumptive test for blood and Abacus Diagnostics Hematrace test for human blood.").

**Plaintiff Ashton's Motion Regarding Spoliation**                                    **– Page 21**

Rezzelle's testing was destructive and, thus, there is no way for anyone to disagree or conduct other tests to check his ostensible results.   Such destructive testing under these conditions constitutes spoliation and justifies a sanction.[113]

**B.      Alternatively, the Court should rule that the following facts are established.**

As an alternative to striking Knight Transportation and Muthee's defenses, the Court should rule that the following facts are established:   (1) Muthee hit Don Ashton, and (2) Muthee hit and killed Don Ashton.  The first three acts of spoliation—failing to stop, continuing to drive on the tires and having the steer tires changed and lost, and scraping evidence from the tractor— were all designed to destroy evidence of these two propositions.  Again, Muthee knew enough to stop at the scene on August 11 and he didn't.  He fled, drove 1,400 miles, and had the two front steer tires changed and lost.  He falsified his duty log.  His cell phone's SIM card is missing, and Knight Transportation refuses to produce the QUALCOMM email-like communications for the hours surrounding the crash.  Nonetheless, Knight Transportation knew enough to arrange for McKinzie to travel to California, inspect the tractor, and remove evidence from it.  At the same time, it didn't cooperate with police.  McKinzie then arranged for Rezzelle to perform destructive testing on evidence removed from the tractor.

**C.      Alternatively, the Court should give adverse-inference instructions to the jury.**

**1.      Adverse-Inference Instruction**

A spoliation instruction entitles the jury to draw an inference that a party who intentionally destroys evidence did so because the evidence was unfavorable to that party.[114]  At

---

[113] *See Sedrati v. Allstate Life Ins. Co.*, 185 F.R.D. 388, 392-93 (M.D. Ga. 1998) (discussing sanctions for destructive testing); *Cate v. Samsonite Furniture Co.*, No. 03A01-9606-CV-00228, 1994 WL 706620, *3-4 (Tenn. Ct. App. Dec. 19, 1994) (unpublished).

[114] *See Russell v. Univ. of Texas of the Permian Basin*, No. 06-50102, 234 Fed. Appx. 195, 2007 WL 1879157, *10 (5th Cir. June 28, 2007) (unpublished) ("A spoliation instruction entitles the jury to draw an inference that a party

page 620 n.20, the *Rimkus* court set out the jury instructions, which the U.S. District Court for

the Southern District of New York gave the jury in *Pension Committee*.[115]  These are the

instructions—

>The court provided the text of the charge:
>
>The Citco Defendants have argued that 2M, Hunnicutt, Coronation, the Chagnon Plaintiffs, Bombardier Trusts, and the Bombardier Foundation destroyed relevant evidence, or failed to prevent the destruction of relevant evidence. This is known as the "spoliation of evidence."
>
>Spoliation is the destruction of evidence or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation. To demonstrate that spoliation occurred, the Citco Defendants bear the burden of proving the following two elements by a preponderance of the evidence: *First,* that *relevant* evidence was destroyed after the duty to preserve arose. Evidence is relevant if it would have clarified a fact at issue in the trial and otherwise would naturally have been introduced into evidence; and
>
>*Second,* that if relevant evidence was destroyed after the duty to preserve arose, the evidence lost would have been favorable to the Citco Defendants. I instruct you, as a matter of law, that each of these plaintiffs failed to preserve evidence after its duty to preserve arose. This failure resulted from their gross negligence in performing their discovery obligations. As a result, you may presume, if you so choose, that such lost evidence was relevant, and that it would have been favorable to the Citco Defendants. In deciding whether to adopt this presumption, you may take into account the egregiousness of the plaintiffs' conduct in failing to preserve the evidence.
>
>However, each of these plaintiffs has offered evidence that (1) no evidence was lost; (2) if evidence was lost, it was not relevant; and (3) if evidence was lost and it was relevant, it would not have been favorable to the Citco Defendants. If you decline to presume that the lost evidence was relevant or would have been favorable to the Citco Defendants, then your consideration of the lost evidence is at an end, and you will *not* draw any inference arising from the lost evidence.

---

who intentionally destroys documents did so because the contents of those documents were unfavorable to that party.").

[115] *See Rimkus Consulting Group, Inc. v. Cammarata*, 688 F. Supp. 2d 598, 620 n.20 (S.D. Tex. 2010) (citing *Pension Committee of Univ. of Montreal Pension Plan v. Banc of America Securities, LLC*, 685 F. Supp. 456, 496-97 (S.D.N.Y. 2010)).

However, if you decide to presume that the lost evidence was relevant and would have been favorable to the Citco Defendants, you must next decide whether any of the following plaintiffs have rebutted that presumption: 2M, Hunnicutt, Coronation, the Chagnon Plaintiffs, Bombardier Trusts, or the Bombardier Foundation. If you determine that a plaintiff has *rebutted* the presumption that the lost evidence was either relevant or favorable to the Citco Defendants, you will *not* draw any inference arising from the lost evidence against that plaintiff. If, on the other hand, you determine that a plaintiff has *not rebutted* the presumption that the lost evidence was both relevant and favorable to the Citco Defendants, you may draw an inference against that plaintiff and in favor of the Citco Defendants-namely that the lost evidence would have been favorable to the Citco Defendants.

Each plaintiff is entitled to your separate consideration. The question as to whether the Citco Defendants have proven spoliation is personal to each plaintiff and must be decided by you as to each plaintiff individually.[ [116]]

As an alternative to a harsher sanction, the Court here could give a similar instruction if it finds that Knight Transportation and Muthee committed spoliation.

## 2.     Or the predicate questions of whether a party committed spoliation may go to the jury.

Even if the Court doesn't determine itself that Knight Transportation and Muthee committed spoliation, the Court may decide that there is sufficient evidence of spoliation to put the questions of whether they committed spoliation (in addition to an adverse-inference instruction) to the jury.  For example, the *Rimkus* court in Houston did this.[117]  There, the court stated that it would instruct the jury that the defendants had a duty to preserve emails and other information that they knew to be relevant in anticipated litigation, ask the jury whether the

---

[116] *See Rimkus Consulting*, 688 F. Supp. 2d at 620 n.20 (S.D. Tex. 2010) (citing *Pension Committee of Univ. of Montreal Pension Plan v. Banc of America Securities, LLC*, 685 F. Supp. 456, 496-97 (S.D.N.Y. 2010)).

[117] *See Rimkus Consulting*, 688 F. Supp. 2d at 620 ("As explained in more detail below, based on the record in this case, this courts makes the preliminary findings necessary to submit the spoliation evidence and an adverse inference instruction to the jury.  But the record also presents conflicting evidence about the reasons the defendants deleted the emails and attachments . . . .  As a result, the jury will not be instructed that the defendants engaged in intentional misconduct.  Instead, the instruction will ask the jury to decide whether the defendants intentionally deleted emails and attachments to prevent their use in litigation.  If the jury finds such misconduct, the jury must then decide, considering all the evidence, whether to infer that the lost information would have been unfavorable to the defendants."); *id.* at 646-47 & n.34 (stating that the jury would hear the evidence about the deletion of emails and attachments and decide whether the defendants committed spoliation).

defendants deleted emails to prevent their use in litigation, and instruct the jury that it may, but wasn't required, to infer that the emails' content would have been unfavorable to the defendants.[118] The Court could give similar instructions here.

**D.     In any event, the Court should rule that Ashton has met her burden on causation or it should shift the burden to Knight Transportation and Muthee.**

On her negligence claim against Muthee, Ashton contends that she must show duty, breach, proximate cause, and damages,[119] and that Texas Pattern Jury Charges No. 4.1 and 2.4 set out the relevant negligence question and proximate-cause test.[120] As a separate argument, Ashton contends that—in light of their contention that Jacob Valek alone killed Don Ashton— the burden shifts to Knight Transportation and Muthee, under Texas case *Trapnell* and Section 433B of the *Restatement (Second) of Torts (1965)*, to prove their contention against Valek (which would also prove that Muthee didn't kill him).[121]

---

[118] *See Rimkus Consulting*, 688 F. Supp. 2d at 646-47.

[119] *See Ruiz v. Guerra*, 293 S.W.3d 706, 718 (Tex. App.—San Antonio 2009, no pet.), *cited in* Plaintiff Kelly Ashton's Response to Defendants' Motion for Summary Judgment (doc 53) and Brief in Support, 18 n.98 (filed July 1, 2010) (doc 56) ("Ashton's Response").

[120] State Bar of Texas, Texas Pattern Jury Charges, PJC 4.1, 2.4 (2006).

[121] *See Trapnell v. Sysco Food Servs, Inc.*, 850 S.W.2d 529, 538-41 (Tex. App.—Corpus Christi 1993) (discussing *Summers v. Tice* and § 433B of the *Restatement*) ("Under current law, if a plaintiff establishes that one or all defendants caused the injury without proving which one, the burden shifts to each defendant to prove that he did not cause the injury."), *aff'd on other grounds*, 890 S.W.2d 796, 802-03 (Tex. 1994) (disagreeing that the plaintiff in *Trapnell* had proven the predicate for § 433B's application but not with the principle of shifting the burden of proof in the right circumstances); *Celotex Corp. v. Tate*, 797 S.W.2d 197, 204 (Tex. App.—Corpus Christi 1990, writ dism'd) ("Thus, when a defendant has caused harm to the plaintiff, he may not  escape liability merely because the harm he has inflicted has combined with similar harm inflicted by other wrongdoers."); *Burlington N. & S.F. Ry. Co.*, 129 S. Ct. 1870, 1881 (2009) ("When two or more causes produce a single, indivisible harm, courts have refused to make an arbitrary apportionment for its own sake, and each of the causes is charged with responsibility for the entire harm."); Restatement (Second) of Torts, § 433B (1965); *Summers v. Tice*, 33 Cal. 2d 80, 85-86 (Cal. 1948) (in bank) ("When two or more persons by their acts are possibly the sole cause of a harm, or when two more acts of the same person are possibly the sole cause, and the plaintiff has introduced evidence that one of the two persons, or one of the same person's two acts, is culpable, then the defendant has the burden of proving that the other person, or his other act, was the sole cause of the harm.") (quoting Wigmore); *id.* at 86 ("When we consider the relative position of the parties and the results that would flow if plaintiff was required to pin the injury on one of the defendants only, a requirement that the burden of proof on that subject be shifted to the defendants becomes manifest.  They are both wrongdoers both negligent toward plaintiff.  They brought about a situation where the negligence of one of them injured the plaintiff, hence it should rest with them each to absolve himself if he can."),

In contrast, Knight Transportation and Muthee argue that Kelly Ashton has the duty to show that Don did not suffer a fatal injury in the Valek impact or that he would have been alive on August 12 or 13 but for Muthee's conduct.[122]  Because their spoliation destroyed evidence relevant to their contention regarding causation and the burden of proof, the Court could, as an alternative, rule that Ashton has met her burden of proof on causation or that the burden shifts to Knight Transportation and Muthee on the issue of causation.  Should the Court rule here that the burden shifts, the shift would be based on the defendants' spoliation of evidence as opposed to *Trapnell* or Section 433B.

**E.      Also in any event, the Court should exclude evidence or testimony based on Rezzelle's ostensible work.**

First, as discussed, McKinzie scraped what he thought was evidence of blood or tissue from the tractor on August 25, 2007, despite the fact that he knew the Kansas police were investigating the August 11 deaths.  He compounded this misconduct by having Rezzelle conduct destructive testing on at least six ostensible samples.  At the same time, Knight Transportation was refusing to cooperate with police and was requiring them to obtain a warrant to search the tractor.  These reasons alone justify the Court in excluding ostensible evidence or testimony based on any work by Rezzelle, including ostensible testing that the material, which McKinzie removed from the tractor, wasn't blood or human blood.

Second, Knight Transportation and Muthee didn't list Rezzelle as a person with knowledge in their initial Rule 26 disclosures, even though they had duty to list persons who might support their defenses, and they didn't list him as an expert.  This separately justifies the

---

*cited in* Plaintiff Kelly Ashton's Response to Defendants' Motion to Strike or Limit the Expert Testimony of Roger Warren, MD, Jaime Oberst, MD, and Kip Ballinger (Doc 63) and Brief in Support, 10 n.39 (filed Sept. 2, 2010) (doc 68).

[122] *See, e.g.*, Knight Transportation's and Muthee's Parts of the Proposed Joint Pretrial Order, 7, 10-11, 13-14 (filed Sept. 10, 2010); Memorandum Opinion & Order, 5-7 (filed Sept. 20, 2010) (doc 80).

Court in excluding ostensible evidence or testimony based on any work by Rezzelle, including ostensible testing that the material, which McKinzie removed from the tractor, wasn't blood or human blood.

## VI.  Conclusion & Prayer for Relief

Trooper Kip Ballinger concluded that Knight Transportation and its ostensible expert, Steve McKinzie, obstructed his investigation.  And after hitting and killing Don Ashton, Muthee fled the scene, removed evidence, and deprived the police of the opportunity to examine his tractor-trailer or give him a mandatory drug test.  He drove approximately 1,400 miles to Nevada where he had the tractor's two front steer tires changed.  A TDS invoice shows that Knight Transportation had knowledge of a "step accident" and let the tires be lost.  In any event, an outside vendor changed the tires, even though Knight Transportation has a facility in the same town.  Despite knowing that the Kansas police were investigating, McKinzie removed what he thought was blood or tissue from the tractor two weeks later, and Rezzelle destructively tested it. Knight Transportation, McKinzie, and Muthee then delayed disclosing the fact of the August 2007 inspection and delayed producing key documents about the company's knowledge and Muthee's driving status until after expert-designation deadlines.  It still refuses to produce QUALCOMM communications with Muthee in the hours surrounding the crash.  And the defendants never listed Rezzelle as a person with knowledge or as an expert.  Therefore, the Court should either strike the defendants' pleadings or defenses, rule that specific facts are established, give adverse-inference instructions to the jury, rule that Ashton has met her burden on causation or shift it to the defendants, and exclude all evidence based on Rezzelle's ostensible work.

Respectfully submitted,

/s/ Michael F. Pezzulli
    MICHAEL F. PEZZULLI
    State Bar No. 15881900
    CHRISTOPHER L. BARNES
    State Bar No. 00792175
    **PEZZULLI BARNES, LLP**
    17300 Preston Road, Suite 220
    Dallas, Texas  75252
    (972) 713-1300
    (972) 713-1333 fax

        **ATTORNEYS FOR PLAINTIFFS**

### CERTIFICATE OF CONFERENCE

The parties have discussed the evidence-production issues numerous times in the past as, for example, the plaintiff's counsel's September 23, 2009 letter to defense counsel (Tab 27), the parties' Joint Status Report (filed Dec. 3, 2009)(doc 43), and the June 2010 emails at Tab 30, show.  Plaintiff Ashton also included a proposed jury instruction on spoliation in her proposed jury instructions filed Sept. 10, 2010.  Also, Michael Pezzulli, Plaintiff Kelly Ashton's counsel, personally conferred with Michael Sharp, Defendant Knight Transportation and George Muthee's Counsel, on September 23, 2010, about this Motion for Sanctions or an adverse-inference jury instruction.  The defendants oppose this Motion.

        /s/Michael F. Pezzulli
        Michael F. Pezzulli

## CERTIFICATE OF SERVICE

I certify that on September 23, 2010, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.  The electronic case filing system sent a "Notice of Electronic Filing" to all attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means.

/s/Michael F. Pezzulli
Christopher L. Barnes