IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| KELLY L. ASHTON, Individually and as the Independent Executor of the Estate of Donald Ray Ashton, Deceased, | § § § § | |
| Plaintiff, | § § | |
| v. | § § | Cause No. 3:09-CV-00759-B |
| KNIGHT TRANSPORTATION, INC. and GEORGE M. MUTHEE, | § § § § | |
| Defendants. | § § | |

**PLAINTIFF KELLY ASHTON'S REPLY
TO DEFENDANTS' FIRST AMENDED RESPONSE
TO KELLY ASHTON'S MOTION
FOR SANCTIONS FOR SPOLIATION
OR
<u>FOR AN ADVERSE-INFERENCE JURY INSTRUCTION</u>**

Defendants Knight Transportation, Inc. and George Muthee want to stipulate that Muthee hit Don Ashton to cover up their spoliation.  But not only does Plaintiff Kelly Ashton decline, but the Court should sanction the defendants.  Muthee fled the scene on August 11, 2007.   The defendants had the two front steer tires changed on August 13.  They knew about the collision on August 13, and a TDS tire invoice shows that Knight knew about it on August 14.  Their agent, Robert S. McKinzie, scraped what he thought was blood from the tractor two weeks later and subjected it to destructive testing, even though he knew the Kansas Highway Patrol was conducting a criminal investigation.  Thus, the defendants omitted mention of McKinzie and his August 25, 2007 examination of the trailer from their initial Rule 26 disclosures and didn't disclose the information until after Ashton's expert-designated deadline in April 2010, and they didn't designate Ryan Rezzelle as an expert at all.  And the defendants continue to withhold their communications with the Kansas prosecutor, despite Ashton's RFPs for them.

## I.  Citations and Appendices

Most of the citations here are to various Tabs, which are in the Appendix in support of Ashton's motion for sanctions (doc 98).  But several citations—*e.g.*, notes 9, 15, 19, 21, 37, 43, 44, 46, 47—are to materials in Tabs behind Appendix No. 2, which Ashton is filing with this reply.

## II.  The Court should impose sanctions for spoliation.

**A.    Muthee fled the scene.**

**1.    Muthee had a duty to stop and not flee.**

A person has a duty to preserve evidence when he or she *should know* that the evidence may be relevant to future litigation.[1]  Here, Muthee entered the debris field, struck debris, hit a

---

[1] *See Rimkus Consulting Group, Inc. v. Cammarata*, 688 F. Supp.2d 598, 612-13 (S.D. Tex. 2010).

**Plaintiff's Reply to Defendants' Response to Her Motion for Sanctions Based on Spoliation        – Page 1**

large piece of metal (which sounded like an explosion), and hit Don.[2]   He drove on, slowed, and

then pulled away.[3]   Contrary to Muthee's argument, the fact that Billy and Deborah Chick, who

were driving a similar 18-wheeler, saw the same debris field and steered around the Hummer and

stopped to render aid,[4] is evidence that the wreckage was visible and that Muthee should have

avoided it.  Also, Ashton doesn't ignore his asserted reasons for driving on to Nevada, she

contends that Muthee is lying.  That's why Muthee falsified his driver's daily log to show that he

was asleep when he was driving through the debris field.[5]

> The police agree that Muthee fled.  Trooper Scott Walker wrote:

> In walking through the accident scene I concluded that the first semi [Muthee]
> had struck the front seat passenger of the Hummer Donald R. Ashton whom was
> ejected onto the fog line.  The parts were conclusive that the vehicle had lost
> faring from the passenger side fuel tank (approximate dimensions 3X7).  Evident
> that significant damage was done to the truck that one would obligate the driver to
> have to notify officials of an accident, and two that would require the driver to
> stop and render aide at an injury/fatality accident.  Neither was done, nor has been
> done to date.[[6]]

In a November 28, 2007 email to a defense attorney, Trooper Kip Ballinger wrote, "The

truck is evidence in a criminal case.  It will be retained until the inspections and examinations

have been complete[d] and will be returned to the Company thereafter.  It is not necessary for us

to provide you with a detailed timeline and description of the examination process as a

prerequisite for assisting us in facilitating the investigation.  If the driver, George Muthee, would

---

[2] *See* Helton's Depo. 167:2-24, Tab 35.

[3] *See* Helton's Depo. at 159:8-160:12, Tab 35.

[4] *See* Declaration of Billy Chick, ¶ 2, Tab 8.

[5] *Compare* Driver's Daily Log, KTI 553-554, Tab  31 (showing that Muthee recorded that he was asleep in his berth during the night of August 10-11, 2007) *with* Knight Transportation Services, Unit Locations Display, KTI 557-62, Tab 3 (showing that Muthee was driving in northern Kansas at the time); Muthee's Depo. at 243:7 -246:24, Tab 38.

[6] Trooper Scott R. Walker, Affidavit 1, PLF-KA 2189-90, Tab 6.

**Plaintiff's Reply to Defendants' Response to Her Motion for Sanctions Based on Spoliation        – Page 2**

not have fled, we would have held the vehicle as long as was necessary to complete our inspections."[7]

### 2. The police would have examined Muthee's tractor-trailer.

Will Helton perceived Muthee's red tractor hit Don Ashton;[8] a truck destroyed Don's body by running over it[9] (despite cutting the body in half, Knight Transportation now contends that Muthee didn't "significantly physically" hit him[10]); and the Kansas Highway Patrol thoroughly searched and examined Billy Chick's tractor-trailer.[11]  Thus, the reasonable inference is that the Patrol would've also inspected Muthee's truck but for him fleeing the scene.  Knight and Muthee now argue that the Patrol "did not conduct any type of scientific testing or analysis of Billy Chick's tractor/trailer to establish or rule out that he may have struck Don Ashton's body."[12]  But the reason why is simple:  Billy Chick didn't hit Don, and there was nothing to test. Even on August 25, McKinzie found what he thought was blood and "fatty tissue" on Muthee's tractor.[13]  The reasonable inference is that the Patrol would have tested these substances had Muthee not fled the scene.  Now, no one will be able to test them because Muthee fled;

---

[7] Email from Trooper Kip Ballinger to Lee Baty, Attorney for Knight Transportation and Muthee, 2, (Nov. 28, 2007), App 30, Tab 1.

[8] *See* Helton's Depo. at 166:8-167:16, 123:3-11, Tab 35.

[9] *See, e.g.*, Warren's Depo. at 74:13-76:2, Tab 6 to Appendix No. 2; Oeberst's Depo. at 96:17-97:22, Tab 8 to Appendix No. 2; Photo, Tab 7 to Appendix No. 2.

[10] *See* Defendants' First Amended Response to Plaintiff's Motion for Sanctions for Spoliation or for Adverse Inference and Brief in Support, 18 (filed Oct. 12, 2010) (doc 104).

[11] *See* Declaration of Billy Chick, ¶ 4, Tab 8.

[12] Defendants' First Amended Response to Plaintiff's Motion for Sanctions for Spoliation or for Adverse Inference and Brief in Support, 14 (filed Oct. 12, 2010) (doc 104).

[13] *See* Email from RS McKinzie to Trooper Kip Ballinger, 1 (Aug. 26, 2007), App. 1, Tab 1.

McKinzie removed evidence from the tractor; and McKinzie and Rezzelle subjected it to destructive testing and haven't produced any such materials here.

### 3. Muthee avoided a drug test as well.

At pages 17–18 and 27 of her motion, Ashton pointed out that Muthee's flight also cost the police the chance to test him for drugs after the collision under 49 C.F.R. § 382.303 when he was driving over hours limits.  Knight and Muthee apparently don't dispute this.

### B. The two front steer tires were changed in Sparks, Nevada, and lost.

Knight Transportation and Muthee argue that they didn't lose the tractor's two front steer tires in bad faith because they didn't know about the collision before August 17, 2007.  But they had the two front steer tires replaced in Sparks, Nevada, on August 13.[14]  The Tire Distribution System Invoice is dated August 13 and states that Muthee's tractor suffered from "side damage from step/*accident*."[15]  "Accident."  At the time, the only way that TDS could've known that Muthee's tractor was involved in an accident was because Muthee told them or because it was obvious from its appearance that it had been involved in an accident (after all, it was missing a 7'x3' piece of fairing, *see* Photo, Tab 5).  Thus, the reasonable inference is that Muthee also told Knight (by QUALCOMM[16] or cell phone[17]) or that Knight could see the same thing that TDS could see from the tractor's appearance (Knight Transportation has a service center in Sparks and

---

[14] *See, e.g.*, Defendant Knight Transportation, Inc.'s 1st Supplemental Responses and Objections to Plaintiffs' First Set of Interrogatories, response to no. 5 (served Dec. 1, 2009), Tab 9 ("Defendant is aware that the two front steer tires were replaced on August 13, 2007 in Sparks, Nevada); Repair Records, KTI 14, 350-51, 604-07, Tab 10.

[15] *See* TDS Invoice, 1, KTI 604, Tab 11 (emphasis added); *see also* Repair Invoices, Tab 1 to Appendix No. 2.

[16] *See* Knight Transportation, Message Directors, Vehicle Mailbox, KTI 578-583, Tab 29.

[17] *See* Photos, Tab 32.

**Plaintiff's Reply to Defendants' Response to Her Motion for Sanctions Based on Spoliation      – Page 4**

facilities in California,[18] and the tractor drove to several locations in Nevada and California on August 13–14, 2007[19]).  Also, Quad K Leasing's (Knight Transportation[20]) Repair Order Detail Report shows that Knight approved the repairs on August 14.[21]  Thus, Knight Transportation learned of the collision before August 17.

Also, Muthee was Knight's employee on August 11, and Knight apparently now wants the Court to believe that Muthee didn't mention the accident before August 17—even though he ran over Don, which left "fatty tissue" hanging under his tractor;[22] a 7'x3' piece of fairing was left at the scene in Kansas;[23] Muthee was in QUALCOMM communication during his drive;[24] the two front steer tires were replaced on August 13; and the SIM card was missing from his cell phone by August 25, 2007.[25]

---

[18] *See* Defendant Knight Transportation, Inc.'s Responses and Objections to Plaintiffs' Third Set of Interrogatories, response to no. 10 (served Apr. 28, 2010), Tab 12 (noting that Knight Transportation has a facility in California where McKinzie examined the tractor); R.S. McKinzie, Report, 13, Tab 13 (stating that the tractor was examined at a Knight Transportation facility in California); Knight Transportation, Website, 1, Tab 17 (showing an operating center in Sparks, Nevada, and facilities in California).

[19] *See* Knight Transportation Services, Unit Locations Display, KTI 565-70, Tab 9 to Appendix No. 2.

[20] *See* Joint Status Report Under the Court's November 20, 2009 Order (Regarding Plaintiff's Motion to Compel Discovery from Defendants Knight Transportation, Inc. and George M. Muthee), 11 (filed Dec. 3, 2009) (doc 43) (stating that Knight Transportation wholly owns Quad K Leasing, Inc.).

[21] *See* Quad K Leasing, Inc., Repair Order Detail Report, 1, KTI 608, Tab 1 to Appendix No. 2 ("Authorized: 08/14/07 by: 1Mast").

[22] *See, e.g.*, Email from RS McKinzie to Trooper Kip Ballinger, 1 (Aug. 26, 2007), Tab 1 ("There was one piece of what appeared to be fatty tissue on the undercarriage.  I did not disturb it.  I was fearful that it might dislodge.  This item might also be grease that is now covered with road grime.").

[23] *See* Trooper Scott Walker, Affidavit, 1, Tab 6 ("In walking through the accident scene I concluded that the first semi had struck the front seat passenger of the Hummer Donald R. Ashton whom was ejected onto the fog line.  I then located parts to the semi in a northeast debris field.  The parts were conclusive that the vehicle had lost faring from the passenger side fuel tank (approximate dimensions 3X7).  Evident that significant damage was done to the truck; that one would obligate the driver to stop and render aide at an injury/fatality accident.  Neither was done, nor has been done to date.").

[24] *See* Knight Transportation, Message Directors, Vehicle Mailbox, KTI 578-583, Tab 29.

[25] *See* Photos, Tab 32.

### C.       McKinzie removed evidence from the tractor.

#### 1.       Knight Transportation and Muthee talked to McKinzie before August 25.

Contrary to Knight Transportation's assertion that it asked McKinzie to inspect the tractor in California on August 25, 2007, it already admitted that McKinzie *inspected* the tractor on August 25,[26] and McKinzie's August 26 email (Tab 1, App 1–2) shows that he had already inspected the tractor *before* he emailed Trooper Kip Ballinger.  Thus, McKinzie was contacted before August 25, 2007 (a Saturday).

#### 2.       No evidence shows that McKinzie talked to the Kansas authorities before he improperly removed evidence.

Trooper Ballinger produced all his emails, and his first one from McKinzie is dated August 26, 2007, (Tab 1, App 1–2) and shows that McKinzie had inspected the tractor before he sent it.[27]  Trooper Ballinger testified that when McKinzie called it was "the *first* time we knew the vehicle had been located and he was in California with it."[28]

Moreover, it doesn't immunize a criminal suspect for him to call the police and say, "I'm removing what I think is blood and tissue from the means of death."  The point is that a suspect, or his employer, shouldn't remove evidence from a truck involved in a hit and run.

#### 3.       McKinzie removed samples without police permission.

Trooper Ballinger testified that McKinzie didn't have the Patrol's permission to examine the tractor.[29]  McKinzie admittedly sent the samples to "a private lab," not to the police.[30]

---

[26] Defendant Knight Transportation, Inc.'s Responses and Objections to Plaintiffs' Third Set of Interrogatories, response to no. 10 (served Apr. 28, 2010), Tab 12 ("Steve McKinzie of McKinzie & Associates, LLC examined the Knight Tractor on or about August 25, 2007.").

[27] *See* Ballinger's Depo. at 7:13-15, 8:2-21, 120:4-121:12, Tab 37 (proving up his email correspondence as Ex 16 to his deposition).

[28] Ballinger's Depo. at 114:3-14, Tab 37.

[29] *See* Ballinger's Depo. at 113:6-115:3, Tab 37.

**Plaintiff's Reply to Defendants' Response to Her Motion for Sanctions Based on Spoliation        – Page 6**

### 4. Knight Transportation didn't cooperate in producing the tractor to authorities.

Contrary to Knight Transportation's suggestion that it cooperated with the Kansas Highway Patrol in making the 2006 Volvo tractor available in time for tissue and blood testing,[31] Detective Ballinger complained to attorney Lee Baty on November 28, 2007 that Knight Transportation's "lack of cooperation and responsive communication" forced him to get Detective Larson of the Ontario, California Police Department to inspect the tractor.[32] And Knight's obstruction worked—the police were never able to gather samples from the tractor. And before Knight disputes that its bad faith didn't cause this, the company left the tractor in an outside yard where it was cannibalized for parts,[33] even though it believed on August 26, 2007, that "fatty tissue" on the tractor's undercarriage was too fragile to be touched or it might

---

[30] *See* Email from RS McKinzie to Trooper Kip Ballinger, 1 (Aug. 26, 2007), Tab 1, App 1-2.

[31] Defendants' First Amended Response to Plaintiff's Motion for Sanctions for Spoliation or for Adverse Inference and Brief in Support, 15 (filed Oct. 12, 2010) (doc 104) ("The evidence goes further and demonstrates that Knight Transportation not only offered the equipment for inspection, but also made offers regarding travel costs if necessary.").

[32] *See* Email from Trooper Ballinger to Lee Baty, 1 (Nov. 28, 2007), Tab 1, App 32 ("Hi Lee!  It is correct that Det. Larson is acting upon my request.  We had originally hoped to be able to coordinate this with you and Steve McKinzie, but due to the lack of cooperation and responsive communication, we have now asked the Ontario CA Police Dept. to assist us."); *see also* Ontario PD Records, 2, City of Ontario Police Dept-02, Tab 33 (discussing how the Ontario PD assisted the KHP in obtaining a warrant to search the tractor).

[33] *See, e.g.*, Email from Trooper Kip Ballinger to Lee Baty, 2 (Nov. 28, 2007), Tab 1, App 30 ("When Det. Larson contacted the lot manager at the Ontario Knight Transportation facility yesterday, he was advised that items have been taken off the vehicle by other drivers, including mud flaps and a rear tail light.  I would expect the mud flaps, by the nature of their position behind the tires, to be a likely place to have collected splatters and debris from the crash scene.  This is critical evidence that Knight Transportation was not only expected to, but has a duty to safeguard and preserve by restricting access to the vehicle until we have had an opportunity to inspect it."); Ballinger's Depo. at 125:10-126:9, Tab 37 (testifying that Knight had failed to preserve the tractor).

"dislodge."[34]   Knight didn't even tell Trooper Ballinger about McKinzie's and Ryan's ostensible tests.[35]

### D.      McKinzie and Rezzelle conducted destructive testing.

Knight Transportation and Muthee seem to argue:  (1) that there's a distinction between McKinzie scraping what he thought was blood from the tractor and altering evidence and (2) that McKinzie and Rezelle didn't destroy any evidence.[36]  But scraping blood from the tractor without police permission *is itself* tampering with evidence.  And McKinzie wants the Court to believe that Rezelle—whom Knight never disclosed as an expert—tested the ostensible samples and didn't find blood.  But Knight Transportation and Muthee never produced any samples in discovery, which shows the ostensible testing was destructive, and they successfully prevented the police from inspecting the tractor in time to gather any of their own.

### E.      Knight Transportation didn't properly produce documents to the authorities either.

Knight states that the Federal Motor Carrier Safety Administration requested documents on August 28, 2007, and that it provided "documents as requested" on September 7.  But the FMCSA asked Knight Transportation for a list of records, including Muthee's employment and driver-qualification files and his witness statements related to the crash.[37]  And on September 1, *2009*, Trooper Ballinger was still complaining that Knight Transportation was refusing to

---

[34] Email from RS McKinzie to Trooper Ballinger, 1 (Aug. 26, 2007), Tab 1, App 1.

[35] *See* Ballinger's Depo. at 121:13-18, 122:17-22, Tab 37 ("I've not been made aware of any of the results of any testing.").

[36] *See, e.g.*, Defendants' First Amended Response to Plaintiff's Motion for Sanctions for Spoliation or for Adverse Inference and Brief in Support, 15-6 (filed Oct. 12, 2010) (doc 104) (arguing that Ballinger "refused to assume that McKinzie had materially altered or destroyed evidence by taking swab samples").

[37] *See* Email from Warren Mallen, FMCSA, to Greg Williams, Knight Transportation, 1-2 (Aug. 28, 2007), Tab 10 to Appendix No. 2.

produce its "driver file on George Muthee."[38]  He stated, "I believe that there may be critical information to this case contained in those records.  They are required by 49 CFR 390.15(a) to provide this information.  They have obstructed my investigation by withholding this information."[39]  He asked the Republic County Attorney (like a district attorney) to subpoena the records from Knight.[40]  And in another email, he wrote, "Despite multiple requests to both the attorney and to Knight Transp, they have refused to provide the information on their driver file on George Muthee.  . . . They have obstructed my investigation by withholding this information."[41]  By September 30, 2009, Trooper Ballinger had to encourage the Republic County Attorney to "aggressively argue against Knight Transportation's Motion to Quash Subpoena for records."[42]  Knight Transportation didn't cooperate.

### III.  Discovery Misconduct

On the one hand, Knight Transportation offers its Safety Director, Brett Sant, to testify that he doesn't "think that Mr. Muthee ever met with anyone from his terminal or from our company after he parked the truck in California" and that he "didn't know that we could ever find Mr. Muthee ourselves,"[43] but, on the other hand, Knight wants to pretend that it hasn't tried to cover up Muthee's wrongdoing in Kansas on August 11, 2007.  But the company hired McKinzie to fly from Kansas to California to inspect the tractor two weeks after the collision,

---

[38] *See* Email from Ballinger to Marlea James, Republic County Attorney 2-3 (Sept. 1, 2009), App 45-47, Tab 1.

[39] *See* Email from Ballinger to Marlea James, Republic County Attorney 2-3 (Sept. 1, 2009), App 45-47, Tab 1.

[40] *See* Email from Ballinger to Marlea James, Republic County Attorney 2-3 (Sept. 1, 2009), App 45-47, Tab 1.

[41] Email from Ballinger to Mary Parmentier, 1 (Sept. 1, 2009), App 47, Tab 1.

[42] Email from Ballinger to Marlea James, Republic County Attorney 1 (Sept. 30, 2009), App 48-49, Tab 1.

[43] Sant's Depo. at 140:11-25, Tab 34; Sant's Depo. at 232:9-233:15, Tab 11 to Appendix No. 2.

hired Kansas attorney Lee Baty to investigate and file a motion to quash a subpoena from the prosecutor to the company,[44] and hired criminal-defense counsel for Muthee.

Far from being red herrings, Knight Transportation's discovery misconduct is part of the evidence of its plan to help Muthee cover up his wrongdoing.  Again, Knight and Muthee concealed McKinzie's existence and August 25, 2007 examination of the tractor in their initial Rule 26 disclosures (and didn't reveal them until after the expert deadlines), concealed the driver violation inquiry (Tab 23) until after the expert-disclosure and leave-to-amend deadlines and until the day before Safety Director's deposition, and concealed various QUALCOMM email-like messages between Muthee and the company until after the expert-disclosure and leave-to-amend deadlines (Tab 29) (and they still haven't produced the QUALCOMM communications for the hours between 10:55:53 on August 10 to 6:46:40 on August 11[45]).

And, again, before they cry "no bad faith," Ashton asked in RFP no. 36 to Knight and RFP no. 27 to Muthee for all their communications, with attachments and enclosures, with the Republic County Attorney.[46]  Although the Republic County Attorney moved to dismiss the felony charges against Muthee and later recommended a diversion agreement to the criminal court,[47] which indicates communications between Muthee and the prosecutor, Knight and Muthee have failed to produce any communications with the prosecutor.  This is obstruction.

---

[44] *See* Sant's Depo. at 142:2-21, Tab 11 to Appendix No. 2; Knight Transportation's Motion to Quash Subpoena for Records, 1-3, *in State of Kansas v. Geo. Muthee*, No. 09-CR-60, Tab 4 to Appendix No. 2.

[45] *See* Email from Michael Pezzulli to Dan Karp, 1 (June 30, 2010, 6:09 p.m.), Tab 30 ("If your translation is correct, the QuallComm data on the 10th of August to 6:46a on the 11th is missing.  So, for over an hour before the crash to over 6 hours after the crash there is no QuallComm data?").

[46] *See* Plaintiff Kelly Ashton's First Requests for Production to Defendant Knight Transportation, Inc., request no. 36 (served July 16, 2009), Tab 21; Defendant George Muthee's Responses & Objections to Plaintiffs' First Set of Requests for Production, request no. 27 (served Sept. 1, 2009), Tab 5 to Appendix No. 2.

[47] *See* Motion to Amend Complaint, 1-2, *in State of Kansas v. Geo. Muthee*, No. 09-CR-60, Tab 3 to Appendix No. 2; Diversion Agreement, *in State of Kansas v. Geo. Muthee*, No. 09-CR-60, Tab 2 to Appendix No. 2.

## IV. Conclusion

Plenty of evidence shows Knight Transportation's and Muthee's spoliation. Thus, the Court may rule that certain causation facts have been established or shift the burden on causation to the defendants. Although they complain that most of their spoliation is relevant only to whether Muthee hit Don Ashton, the fact is that Muthee also negligently hit Don Ashton and destroyed his body. The Court may fashion a remedy—even if it's not directly for spoliation—to relieve a party of the unfair prejudice of another's negligent destruction of evidence under the principle that parties should bear the risk of their own negligence.[48] Or the Court may give one of two kinds of jury instructions: (1) an instruction that the defendants committed spoliation and informing the jury that it may draw an inference as a result, or (2) a set of questions, which allow the jury itself to decide whether a party committed spoliation and, if so, what inference to draw as a result.[49]

---

[48] *See Rimkus Consulting*, 688 F. Supp. 2d at 615 ("The court applied case law in the Second Circuit, including the language in *Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99, 108 (2d Cir. 2002) (stating that the sanction of an adverse inference may be appropriate in some cases involving negligent destruction of evidence because each party should bear the risk of its own negligence.") (citing other cases, which imposed sanctions for the negligent destruction of evidence); *Harris v. Cleveland*, 294 S.W.2d 235, 241 (Tex. App.—Galveston 1956, writ dism'd) ("Otherwise, a wrongdoer would be in a position to inflict injury on his neighbor and escape responsibility. It is clear these decisions [*e.g.*, *Summers v. Tice*] are based on justice. In effect they rest on the thought that it should not lie in the mouth of an admitted wrongdoer to deny causal relationship where his own wrong has contributed to produce a situation which makes it impossible for plaintiff to establish such relationship.").

[49] *See* Plaintiff's Motion for Sanctions for Spoliation, 22-25 (filed Sept. 23, 2010) (doc 98) (discussing these two types of instructions as discussed in *Rimkus*, 688 F. Supp.2d at 620 n.20, 646-47).

Respectfully submitted,

/s/ Michael F. Pezzulli____
    MICHAEL F. PEZZULLI
    State Bar No. 15881900
    CHRISTOPHER L. BARNES
    State Bar No. 00792175
    **PEZZULLI BARNES, LLP**
    17300 Preston Road, Suite 220
    Dallas, Texas  75252
    (972) 713-1300
    (972) 713-1333 fax

**ATTORNEYS FOR PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

I certify that on October 19, 2010, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.  The electronic case filing system sent a "Notice of Electronic Filing" to all attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means.

    /s/Michael F. Pezzulli
    Christopher L. Barnes