# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

KELLY L. ASHTON, Individually and as §
the Independent Executor of the Estate §
of Donald Ray Ashton, Deceased, §
§
    Plaintiff, §
§
v. §     CIVIL ACTION NO. 3:09-CV-0759-B
§
KNIGHT TRANSPORTATION, INC. §
and GEORGE M. MUTHEE, §
§
    Defendants. §

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiff Kelly Ashton's Motion for Sanctions for Spoliation or for an Adverse-Inference Jury Instruction ("Motion for Sanctions") (doc. 98), filed September 23, 2010. At issue is whether the Defendants destroyed or otherwise altered evidence they had a duty to preserve, and if so, the appropriate sanction for such conduct. For the reasons stated below, the Court **GRANTS** Plaintiff's Motion for Sanctions.

## I.

## BACKGROUND[1]

### A.    *Basic Facts*

As set forth in previous filings of the Court, this action arises out of an automobile accident occurring in Republic County, Kansas on August 11, 2007. (Defs.' Mot. Summ. J. 1). Plaintiff Kelly

---

[1]The Court takes its factual account from the testimony given at the spoliation hearing, as well as the parties' papers and pleadings.

Ashton, her husband Don Ashton, and friend William Helton were returning to Texas from South Dakota along U.S. Hwy. 81 in the Ashton's 2006 Hummer H3. (*Id.*). While driving through Kansas, the Hummer was struck by a 1988 Chevrolet Camaro driven by Jacob Valek, a 15-year-old minor who, while under the influence of alcohol, had ignored a stop sign. Sometime during or soon after the collision with Mr. Valek, Don Ashton died. Precisely what caused Don Ashton's death lies at the heart of this case.

Plaintiff contends that Mr. Ashton survived the accident, crawling out of the Hummer and onto U.S. Hwy 81, where he was subsequently run over and killed by an eighteen-wheeler operated by Defendant George Muthee ("Muthee") and owned by Defendant Knight Transportation ("Knight"). (Pl.'s Resp. 2-4). Defendants, on the other hand, maintain that Mr. Ashton died as a result of the initial crash with Valek, not due to any contact with the vehicle driven by Muthee. (Defs.' Mot. Summ. J. 1-2).

B.     *Procedural Background*

The Defendants filed a Motion for Summary Judgment on May 24, 2010, arguing, *inter alia*, that Plaintiff could not prove that Muthee was the proximate cause of Don Ashton's death. The Court denied the Defendants' motion on September 20, 2010, finding that Plaintiff had presented sufficient summary judgment evidence to raise a genuine factual dispute over whether Muthee's eighteen-wheeler struck Don Ashton and whether Don Ashton was alive at the time he was struck (doc. 80). The case proceeded toward trial. On the eve of the pretrial conference, Plaintiff filed her Motion for Sanctions (doc. 98), alleging that Defendants had engaged in a bad faith course of conduct by destroying, altering, and concealing evidence, before and after the filing of this suit. (Pl.'s Mot. Sanctions 6-15).

Because of the serious nature of Plaintiff's allegations, the Court determined that the spoliation issue should be decided prior to the commencement of trial. The Court thus entered an order continuing the trial setting, establishing a briefing schedule on the Motion for Sanctions, and setting an evidentiary hearing on the spoliation issue (doc. 100). Defendants responded to the Motion for Sanctions (doc. 104), and Plaintiff replied (doc. 108). After a three-day evidentiary hearing and a full opportunity to review the evidence and to assess the credibility of each witness, the Court finds that Plaintiff has proven by clear and convincing evidence that the Defendants engaged in evidence spoliation and that they should be sanctioned accordingly. The parties' contentions and the pertinent facts follow.

## II.

## PARTIES' ARGUMENTS ON SPOLIATION

A. *Plaintiff's Contentions*

Plaintiff maintains that Defendants, Knight and Muthee, intentionally altered or destroyed two key pieces of evidence in this case, both highly unfavorable to the defense. First, she contends that the Defendants destroyed evidence on Muthee's truck and tires that implicated the Defendants in Don Ashton's death. (Pl.'s Mot. Sanctions 6-9). Second, Plaintiff maintains that the Defendants intentionally destroyed or altered Qualcomm communications between Muthee and Knight, which occurred in the hours and days surrounding the accident and which evidenced Knight's complicity in Muthee's post-accident conduct. (*Id.* at 15). Plaintiff recites a litany of facts, beginning in the

aftermath of the accident, which she maintains establish the Defendants' bad faith course of conduct. Specifically, Plaintiff makes the following contentions:[2]

- Will Helton, who was in the Hummer with the Ashtons on the night of the accident, has stated that Don Ashton was alive after the initial impact by Valek but that as Muthee drove through the debris field Helton heard a loud explosion after which he found Ashton's body in pieces;
- Muthee immediately fled from the scene of the accident depriving the Kansas Highway Patrol ("KHP") of the opportunity to examine the eighteen-wheeler and to test Muthee's blood;
- Muthee failed to return to the accident scene or contact Kansas police even after stopping within a mile of the accident and observing that his truck had been damaged and was missing its fairing;
- A 7' x 3' piece of fairing from Muthee's truck was dislodged as he drove through the debris field;
- The dislodged fairing was used by KHP to connect Knight's truck to the accident scene;
- Muthee falsified his driver's log for the time period he was involved in the accident, attempting to make it appear he was sleeping in his berth in Nebraska at the time of the Kansas accident;
- After the accident, Muthee continued driving approximately 1,400 miles to Sparks, Nevada where he had the truck's two front steer tires replaced, the replacement authorized and paid for by Knight. The tires are now "lost";
- Muthee drove the truck to California, parking it in a Home Depot parking lot where it was retrieved by Knight employees who returned it to Knight's facility in California;
- Knight hired a lawyer and investigator within days of the accident for itself and Muthee;
- Within days of the accident, Knight's lawyer and investigator inspected and performed destructive testing on the truck at Knight's facility in California, removing samples of "flesh" from the truck and placed the samples in baggies before any law enforcement officials were able to inspect the truck;
- Knight failed to cooperate with KHP's investigation of the accident by blocking its efforts to interview Muthee and to obtain key documents in its possession such as Muthee's driver file. The lack of cooperation is evidenced in a series of e-mails between KHP and others involved in the investigation, including one in which a KHP trooper laments that the Defendants "have obstructed my investigation";

---

[2] Plaintiff's allegations are drawn from her briefing on the spoilation issue as well as her counsel's arguments at the evidentiary hearing.

- During discovery in this case, Knight concealed their private investigator's August 2007 inspection of the tractor until after the court-imposed expert designation deadline, and were later forced to reveal the inspection by interrogatory in April 2010;

- Knight delayed production of a document showing that it knew that Muthee was illegally driving over hours in the days and hours leading up to the crash, until after the expert designation deadlines;

- Knight failed to preserve Qualcomm, (e-mail type messages) between itself and Muthee during the critical hours surrounding the accident and much of what it did produce for the communications in the days surrounding the accident was in an illegible format.

(*See generally id.*).

B.  *Defendants' Response*

The Defendants flatly deny that they engaged in spoliation and maintain that Plaintiff cannot meet her burden of proof to establish otherwise. They question whether they had a legal duty to preserve the evidence they are accused of destroying given that their alleged actions occurred "prior to the litigation in this cause" and they were under no "court order to preserve evidence" prior to suit being filed. (Defs.' Resp. 4-5, 7).

As for Plaintiff's factual allegations, the Defendants do not dispute that Muthee drove through the accident debris field and, in so doing, that his truck "contacted" Don Ashton.[3] The Defendants further agree that Muthee failed to stop at the accident site, left the state of Kansas, got the two front steer tires replaced, and returned the truck to a parking lot in California, where Knight employees retrieved it. The Defendants, however, strongly deny that Muthee did these things with

---

[3]Defendants originally argued in their Motion for Summary Judgement that "there is simply no competent evidence of any contact whatsoever between Muthee's vehicle and Ashton's body." (Defs.' Mot. Summ. J. 1-2). In an about-face, at the pretrial conference (after the Court had denied Defendants' Motion for Summary Judgment (doc. 80)), Defendants sought to stipulate that the vehicle driven by Muthee did contact Ashton's body, and therefore the only issue was whether or not Ashton was already dead or dying before the contact with Muthee's vehicle. However, this stipulation was never accepted by Plaintiff nor formally offered to the Court.

Knight's knowledge or under its direction. Knight maintains that—to date—Muthee has never communicated with the company about the accident or his post-accident conduct. Knight also maintains that it has not attempted to obtain a statement or an explanation from Muthee about the accident or his actions following the accident, insisting that Muthee acted on his own from the time he departed the accident scene until he abandoned Knight's truck in Los Angeles.

Curiously, in view of its professed lack of involvement with Muthee's post-accident decisions, Knight nevertheless defends him, arguing that he did not realize he had hit something in the accident debris field and, consequently, that his actions following the accident were "innocuous."[4] (*Id.* at 13-16).

As for the host of other factual allegations by Plaintiff, the Defendants either deny them or dismiss them as "red herrings" and "leaps of logic." (*Id.* at 8-16). They deny obstructing KHP's attempts to inspect the truck once it was returned to Knight's custody in California. And, instead, insist that the inspection and testing of Muthee's truck by Knight's private investigator and lawyer was conducted "with the full knowledge of the Kansas Highway Patrol." (*Id.* at 10). In any event, the Defendants assert that Plaintiff has provided "no explanation" for her theory that the suspect truck, if made available for inspection, would have yielded relevant evidence regarding the cause of Ashton's death. (*Id.*). Finally, the Defendants deny engaging in obstructionist discovery tactics.

In sum, the Defendants do not dispute many of the facts that Plaintiff relies on in support of her motion for sanctions. What is hotly contested between the parties and at the core of the

---

[4] Knight appears to rely on Muthee's deposition testimony—taken by Plaintiff in this case—to support its position that Muthee did not realize he had hit something in the debris field. Given that the company claims, despite hiring counsel for Muthee, that it has never spoken to Muthee about his version of events, the deposition would be the only source for its arguments in Muthee's defense.

Court's spoilation inquiry is whether these events were, as argued by Plaintiff, part of a deliberate effort orchestrated by Knight and Muthee to conceal their culpability for the death of Don Ashton or, as urged by Defendants, simply an innocuous series of events triggered by Muthee's ill-advised exit from the accident scene. Witness credibility is therefore a critical component of the Court's resolution of the spoilation issue. A review of the testimony at the evidentiary hearing follows, accompanied by the Court's credibility determinations and assessment of the evidence.

## III.

## EVIDENTIARY HEARING

A.  *Plaintiff's Evidence*

    i.  <u>Christopher Sandberg</u>

Plaintiff's first witness was Christopher Sandberg, a former Yard Manager for Knight Transportation who was in charge of the Fontana Yard in California where the tractor in question was taken after the accident. (I, 22-23).[5] Sandberg's testimony covered the events beginning immediately after Muthee abandoned Knight's truck in a Los Angeles-area parking lot and continued through the time period after Sandberg retrieved the truck and placed it at Knight's Fontana Yard facility.

Sandberg described Fontana Yard as a "drop yard" where repairs are made to trucks. (*Id.* at 29). He testified that in August 2007, he was instructed by someone from Knight management in Arizona to retrieve Muthee's truck. (*Id.* at 25-26). He testified that when he got to the site where

---

[5] The three-volume transcript of the evidentiary hearing in this case, held November 16, 2010, through November 18, 2010, is denoted throughout this Opinion as "I, II and III," respectively, with an accompanying cite to the relevant page number(s). For clarity and efficiency's sake, formal Bluebook citation to "Hr'g Tr. vol." is omitted.

the truck was located, he talked to Knight officials on the phone who told him the vehicle had been in an accident and asked him whether there was any damage to the truck. (*Id.* at 26, 28, 41-42). He responded that part of the fairing was missing. (*Id.* at 26). Sandberg, a former Knight truck driver, described the fairing as an expensive piece of equipment and that a driver would be in trouble for leaving a piece of equipment like that on the road. (*Id.* at 26-27). He also testified that any driver involved in an accident is supposed to notify the trucking company. (*Id.* at 93). He said that the trucks are equipped with satellite equipment that enabled Knight officials to track the truck's location. (*Id.* at 107-09). He also said that Knight's company policy required drivers to contact the company and get its approval before money was spent on truck repairs, including tire replacements. (*Id.* at 99-100). He stated that the drivers must tell the company why the tires need to be changed or replaced and that the company would dictate the vendor to do the work and approve payment. (*Id.* at 99-106). He said that once he told Knight about the damage to Muthee's truck, that the truck "sat" out in the open in the Fontana yard for "a couple of weeks." (*Id.* at 30-31). He said that during those weeks the right mud flap and one of the truck's tail lights were removed. (*Id.* at 34).

Sandberg further testified that on August 25 or 26, 2007, approximately two weeks after he picked up the truck, a lawyer and investigator working for Knight came out to the yard and took pictures and inspected the truck. (*Id.* at 31, 41-44). He said that Knight's lawyer told him that they were there "to let us know that there was actually flesh underneath the truck" and that the truck had been in an accident. (*Id.* at 44, 46-47). Sandberg said that for approximately one hour he observed the investigator use "swabs" to take "substances" the attorney described as "flesh"from the body of the truck and then put the swabs into plastic bags. (*Id.* at 47-49). Sandberg, who had

managed the yard for three years, stated that he told Knight officials that the truck was not adequately protected from wind, sand and other elements for the months it was in the yard. (*Id.* at 52). He said he was concerned that the truck, which he was told by Knight and its attorney had been involved in an accident and had some human flesh on it, was "getting sandblasted" by being outdoors in the yard. (*Id.* at 54). He said that after the truck had been in the yard for three months, Ontario, California police officials came out to look at it. (*Id.* at 24, 58-59). He said he told the police about the missing mudflap and rear tail light and the inspection by Knight's lawyer and investigator. (*Id.*).

Sandberg said that shortly after he discussed the condition of the truck with Ontario police, Knight terminated him, after eight years of employment. (*Id.* at 23-24, 59). He said there was no reason for his firing and that he had "increased profits" at the yard more than prior managers. (*Id.* at 23). He said, by way of explanation for his firing, that he was later told by a Knight employee "you talk too much." (*Id.* at 61).

Sandberg was a credible witness who did not veer from the key portions of his direct testimony on cross-examination. In essence he established that, in August 2007, he was directed to retrieve Muthee's truck by Knight officials who informed him that the truck had been in an accident. He further established that within a few weeks after he picked up the truck, Knight's lawyer and investigator came out to the yard to inspect and test it and that the lawyer told him that there was "flesh" underneath the truck. Sandberg's testimony showed that the investigator took samples from the truck with swabs and placed them in baggies. He also established that the truck was left exposed to the wind and sand even though it was partially covered by tarps. He credibly established, as a former eight-year employee, that it was Knight's policy to require approval before getting repair work done to its trucks. Finally, the fact that Sandberg was terminated after eight

years of employment soon after he told the Ontario police about the private investigator's inspection of the truck and the missing mudflap and tail light bolstered Plaintiff's theory that Knight's assurances to KHP that it would cooperate were questionable.

### ii. Trooper Kip Ballinger

Plaintiff's second witness was Trooper Kip Ballinger, Kansas Highway Patrol's ("KHP") chief investigator of the Kansas accident scene. His testimony, a key part of Plaintiff's case, focused on his investigation of the accident and his communications and interactions with the Defendants, their lawyers and agents over the course of his investigation. The primary focus of Ballinger's testimony was the basis for his opinion that Knight and its lawyers obstructed his investigation.

Ballinger, part of the KHP critical highway accident response team, testified that he was called to the Kansas accident scene the night of the crash. (I, 115-18). After examining the accident site and inspecting the dislodged piece of fairing found at the site, Ballinger concluded that a third vehicle, not found at the scene, had been involved in the accident. (*Id.* at 118-19; Pl.'s Ex. 3). He said that certain identifiers on the fairing enabled KHP investigators to trace it to Knight Transportation and then contact the company directly. (I, 119-21). He stated that he first discovered that Muthee's truck had been located by Knight when he was called by Steve McKinzie, Knight's private investigator and a former KHP trooper and colleague of Ballinger's. (*Id.* at 123-25).

Ballinger said McKinzie called him on August 25, 2007, from the Fontana yard where the truck was located and told him that he was at the yard to inspect the truck. (*Id.* at 123, 125-26). Ballinger said McKinzie had not contacted him about the truck or his desire to inspect the truck before this call from the Fontana yard. (*Id.* at 123, 127). Nor, he said, did McKinzie or anyone from Knight ask Ballinger to accompany McKinzie to the yard. (*Id.*). Ballinger stated that he did not

authorize McKinzie to conduct any type of destructive testing on the truck. (*Id.* at 125-27). Ballinger said that McKinzie followed up with an e-mail the day after he examined the truck and described his initial conclusions from his inspection. (*Id.* at 127; Pl.'s Ex. 52). Ballinger testified that McKinzie, reported to him that he "found nothing that indicated a body contact" and that it appeared that the truck "did not hit a person." (I, 127-32, Pl.'s Ex. 52). Ballinger testified that McKinzie assured him that Knight would fully cooperate with Kansas authorities. (I, 131-32; Pl.'s Ex. 52).

Ballinger testified at length about his frustration following McKinzie's initial assurances of cooperation when his efforts to obtain information from Knight were consistently stymied by the company and its lawyers. (I, 121-23, 137-153, 156-59, 160-64, 179-80).[6] His testimony was corroborated by a series of e-mails, admitted as Plaintiff's Exhibit 52, between August 26, 2007 and

---

[6] Ballinger's frustration over Knight's lack of cooperation is reflected his September 30, 2009 e-mail to a law enforcement official in Republic County, Kansas:

> As far as I'm concerned, Knight Transportation, both directly and through its legal counsel, is in violation of this statute [49 C.F.R. § 390.15(a)]. They have refused or ignored all of my requests to obtain any statements made by George Muthee regarding the crash. I have a considerable amount of email correspondence requesting their cooperation in investigating this crash. They would not make him available for an interview. Knight has obstructed the legal process all the way through and is subject to criminal charges themselves. The truck, trailer, driver, and records were in their possession, when it was determined that their truck was involved. Muthee changed out two tires in Las Vegas on the following day. Knight may have had knowledge of the crash if they had to authorize the purchase of two tires. They immediately retained Steve McKinzie and flew him to Ontario, CA to inspect the truck before notifying Law Enforcement that they had the vehicle. McKinzie made scrapings from the vehicle for his analysis, potentially destroying valuable evidence prior to being examined by law enforcement. Knight stored the vehicle outside in an open lot where it was unsecured and parts were cannibalized from it prior to us being able to have it inspected. In other words, they have stymied our investigation all along.

(Pl.'s Ex. 52 at 48-49).

December 17, 2009. (Pl.'s Ex. 52). The e-mails, between Ballinger and Knight's attorney, Lee Baty, and between Ballinger and other law enforcement officials, document multiple attempts by Ballinger to enlist Knight's assistance to obtain an interview with Muthee and to procure documents in Knight's possession related to the accident. (I, 122-23; Pl.'s Ex. 52 at 3-6). The documents that Ballinger requested from Knight included: Muthee's e-mail or other communications with Knight from August 10 through August 24, 2007, Muthee's driver file, his driver logbook, receipts from his Kansas trip, his vehicle inspection and repair records, any statements by Muthee about the accident, and any other records relating to Ballinger's investigation. (I, 125-164; Pl.'s Ex. 52 at 3, 5-6). The e-mails reflect Ballinger's growing concern with Knight's delay in making Muthee available for an interview and to produce the documents requested. (I,122-23, 135-37, 154-64; Pl.'s Ex. 52 at 7, 8, 11,12, 13, 14, 18, 32, 35). For example, despite numerous requests by Ballinger to interview Muthee beginning in late August 2007 and Baty's repeated assurances to acquiesce, it was not until October 25, 2007, that Baty informed Ballinger via e-mail that "Muthee is no longer employed at Knight Transportation. He had not returned to work and subsequently has submitted a resignation. I understand that he is also being represented by counsel to advise him personally." (I, 123; Pl.'s Ex. 52 at 3-21). This is despite the fact that Baty had been acting as Muthee's lawyer since a few days after the accident. (II, 72).

Despite Ballinger's request for documents in an August 28, 2007 e-mail and Baty's assurances on August 29, 2007, to have the documents available by "early next week," by December 7, 2007, Ballinger still had not received many of the critical records. (Pl.'s Ex. 52 at 35). Ballinger testified that Knight never provided him with Muthee's employment file so he could determine, among other things, whether Muthee had any driver's violations. (I, 180). Ballinger said that

Knight did comply with his request to give him copies of Muthee's "daily driver logs" to show how many hours Muthee had driven in the period immediately preceding the accident. (*Id.* at 237-38, 240; Pl.'s Ex. 28). Ballinger said the logs showed Muthee to be sleeping in his truck's berth in Nebraska at the time of the accident. (I, 238-40; Pl.'s Ex. 28). He stated he later learned that the driver logs that Knight had given him had been falsified. (I, 238). He also said Knight did not disclose to him, that, in truth, Muthee had been driving 60-65 hours, in violation of federal laws, at the time he drove through the Kansas debris field. (*Id.* at 241-43). Ballinger confirmed that Muthee was charged criminally with leaving the accident scene. (*Id.* at 246-7).[7]

On cross-examination, Ballinger was challenged for not confronting McKinzie and Knight with his belief that they were obstructing his investigation. (*Id.* at 200-08). When asked why he did not confront his former colleague McKinzie about his concerns, he indicated that, based on his prior relationship with McKinzie, he "had no reason to believe that . . . [McKinzie] would maliciously destroy evidence." (*Id.* at 208).

In all, Ballinger was a very credible witness. His demeanor and his recollection of the facts evidenced an earnest individual who was forthright in recounting his version of events. He explained credibly that he did not express concerns about Knight and McKinzie's actions sooner because of his prior law enforcement relationship with McKinzie and because he trusted him to

---

[7] Ballinger testified that his own investigation led him to conclude that Don Ashton had been struck by an eighteen-wheeler. (I, 166-67). He explained his opinion was based upon a review of pattern of Ashton's blood and body parts found at the scene. (*Id.* at 168-70). He said that Ashton's body was found in "three different pieces". (*Id.* at 170). He explained the blood spatter patterns, the position of the body parts as well as "dual wheel tire marks" which were darker at the "area of impact" formed part of the basis for his opinion that Ashton was hit by an eighteen-wheeler. (*Id.* at 169-71). Ballinger testified that in seventeen years as an accident investigator, Knight's inspection of Muthee's truck was the only instance he was aware of where a private, interested party was able to inspect an accident vehicle before the police. (*Id.* at 234-35).

follow through on his promise that Knight would cooperate in the investigation. The collection of e-mails in Plaintiff's Exhibit 52 strongly supports Ballinger's testimony that, initially, he believed McKinzie's promises to cooperate, and that his trust later turned to dismay that McKinzie and Knight were purposefully obstructing his investigation. It was also clear from Ballinger's testimony that McKinzie's, Knight's, and Muthee's actions prevented him from collecting critical evidence immediately after and in the days and weeks following the accident including, but not limited to, inspecting the truck and its tires as they appeared immediately after Muthee's truck drove through the scene or as soon thereafter as possible, interviewing Muthee and obtaining a blood sample from him, and obtaining the Qualcomm communications as they appeared in their screen-shot format.

### iii. Robert McKinzie

The third chronological witness, private investigator and former KHP trooper Robert McKinzie, was called by the Defendants out of order due to scheduling issues. McKinzie was hired by Knight as a private investigator to look into the Kansas accident. McKinzie testified about his investigation as well as his communications with and interactions with KHP and Plaintiff's representatives.

McKinzie, Ballinger's former supervisor at KHP who is now a private investigator specializing in accident reconstruction, was hired on August 19, 2007, by Knight's lawyers at the Baty law firm to investigate the accident. (I, 251-56). Touting his accident reconstruction qualifications, he testified that, when working for KHP, he "wrote" the policies and procedures for gathering and securing evidence from accident scenes. (*Id.* at 254). He said that, in his private capacity, KHP still calls on him to provide accident reconstruction training and consulting. (*Id.* at 255). An outgrowth of his relationship with KHP, according to McKinzie, is that he said he still has the home

and cell phone numbers for most of his former KHP colleagues, including Ballinger. (*Id.* at 262). He said he was asked by Knight's lawyers to go to the Fontana yard to inspect the truck. (*Id.* at 256-57). In direct conflict with Ballinger's version of events, McKinzie testified that he told Ballinger about his plans to travel to California to inspect the truck *before* he made the trip and asked Ballinger if he was going to California as well. (*Id.* at 258-59). Also contradictory to Ballinger's testimony, McKinzie said Ballinger declined the trip but that Ballinger, nevertheless, knew that McKinzie planned to "do a thorough examination of the truck." (*Id.* at 259-60). He claimed that he told Ballinger, in advance of his inspection, about the type of inspection and sampling he intended to do. (*Id.*). He testified that, in inspecting the truck, he observed "a piece of debris" on the undercarriage of the tractor but that he did not "touch it." (*Id.* at 266, 291-92). Although he states he did not "touch" or test the tissue, he later stated that the test results he received back from a private testing lab "on all the other samples [he] collected" allowed him to conclude that the tissue he did not submit for testing was not human. (*Id.* at 292-93). Also as to the tissue, McKinzie claimed he did not mention it to the Knight employees at the yard, in conflict with Sandberg's testimony that Ms. Otto, accompanied by McKinzie, told him there was flesh on the truck. I, 303.

McKinzie agreed that in August 2007, he told Ballinger in an e-mail that Knight would make Muthee available to him. (II, 17-21). Despite being hired by Lee Baty, the attorney for both Knight and Muthee, McKinzie testified that— to date—he has never spoken to Muthee and that he did not even know if Baty had ever spoken to Muthee. (I, 258, 298). He later maintained that he did not know that Baty was actually in touch with Muthee. (II, 40). He stubbornly refused to acknowledge that he "vouched" for Knight in his initial e-mail to Ballinger where he wrote "I've known these folks for years and have no doubt that they will be cooperative . . . ." (I, 298-99).

On cross-examination by Plaintiff's counsel, McKinzie became argumentative, tangling with Plaintiff's counsel on even minor issues such as whether Ballinger was a "qualified state trooper." (*Id.* at 277-280). More than once, the Court had to direct him to be responsive to the questions posed. He did admit that he had no phone records to substantiate his claim that he had called Ballinger twice before he traveled to California. (*Id.* at 280-82). He conceded that he took samples of "foreign material" from the exterior of the truck but insisted he did so with KHP's permission through Ballinger. (*Id.* at 307-08). He said he sent the samples for private testing and never turned them over to Ballinger because "he never asked for them." (*Id.* at 309-12). He said that everything he did was with the knowledge and consent of Knight's counsel, Lee Baty. (*Id.* at 309-10). He continually insisted that, although he represented a potential defendant in a traffic fatality investigation, Ballinger had authorized him to inspect and conduct destructive testing on the truck and samples taken from the truck. (II, 16). He absurdly insisted that allowing interested private parties access to accident vehicles before police is something he would train KHP accident investigators to do in certain circumstances. (*Id.* at 27-36).

McKinzie ultimately conceded that his role in inspecting the truck for Knight, a potentially liable party, "could" have presented a conflict of interest for him with respect to his dealings with KHP officials investigating the accident. (*Id.* at 66-67). He did admit that the optimal conditions for KHP's investigation would have been if the truck had remained at the scene. (*Id.* at 67). He further conceded that KHP would not have permitted Muthee to remove the truck from the scene or drive it across state lines had they been notified before he left the scene and the state. (*Id.* at 67-68). And he agreed that if Knight had instructed Muthee to leave the state, that it would have been against the law. (*Id.* at 68).

McKinzie also conceded some irregularities in his written report, composed March 17, 2010, for the Baty law firm in connection with this civil action. (Pl.'s Ex. 45). Specifically he agreed that the written report for this suit contained no indication that McKinzie himself had been the one who conducted the August 25, 2007 inspection or precisely what he did in conducting his inspection. (I, 285-89, 291-93, 297). He further conceded that the written report failed to mention what he told Ballinger in August, 2007 that he had observed "fatty tissue" on the truck's undercarriage. (*Id.* at 288-91). He agreed that his written report, instead concluded that after a "thorough examination of the vehicle's exterior and undercarriage" he found "no trace of contacting a body." (*Id.* at 288). He also agreed that he took around 175 photographs of the truck during his August 25, 2007 inspection but failed to mention the pictures in his written report instead indicating that KHP was responsible for the photos in his report. (*Id.* at 294-97).

McKinzie's testimony was problematic for several reasons. For starters, McKinzie had an undeniable conflict of interest in accepting employment with a trucking company under investigation for a traffic fatality and then assuming the lead role in inspecting the very truck suspected in the crash. Resting on his strong ties with KHP, all the while assuring KHP that Knight would fully cooperate, McKinzie appears to have initially lulled his former law enforcement colleagues into not questioning his motives or his clear conflict of interest. This partially explains how he was able to position himself in the highly irregular role of being the first person to inspect the suspect truck.

Further, McKinzie's testimony conflicted with Ballinger's in important respects. McKinzie maintained that he told Ballinger he was going to inspect and test the truck before he took the trip to California and that Ballinger had "authorized" the inspection. Yet there is no evidence to support

this claim other than McKinzie's word.[8]  Ballinger categorically denies that McKinzie called him before taking the trip or that he ever authorized McKinzie's inspection.  And Ballinger's account is certainly the more reasonable of the two versions.  Ballinger testified that this was the first time in seventeen years of investigating accident scenes that he has seen an interested private party inspect an accident vehicle before law enforcement had access to it.  McKinzie did not deny that his access to the truck under these circumstances was atypical.  It stands to reason that Ballinger would not "authorize" such an aberration in KHP's procedures, particularly in a case involving a fatality.  And it is further reasonable to infer that McKinzie's lack of candor on this point evidences his questionable motives in undertaking the inspection and testing of the truck on behalf of Knight in the first place.  The subsequent wholesale failure by Knight to cooperate with KHP, despite McKinzie's assurances, is further proof that McKinzie was not being candid in his account of the facts.

Another troubling area of McKinzie's testimony was his description of his actions at the Fontana yard.  McKinizie's account of events at the yard was simply not reasonable in parts and conflicted in key respects with Christopher Sandberg's.  Sandberg credibly testified that on August 25, 2007, when McKinzie and Knight's lawyer came out to the yard to inspect the truck, that the lawyer told Sandberg "that there was actually *flesh* underneath the truck." (I, 46-47).  McKinzie, in contrast, gave no indication that the conversation Sandberg described about the "flesh" even took place.  McKinzie testified that the "folks" at the yard were not told about his observations of the truck, leaving the impression that the conversation Sandberg described with Otto did not occur.

_____

[8] Lee Baty at first testified he also had spoken to Ballinger before the trip but later admitted he could not be sure if the conversation took place.

Whether the "tissue" he stated he observed was actually human flesh or not, McKinzie's testimony that he never tested it is nothing short of baffling. If McKinzie was "authorized", as he claimed, by KHP to conduct testing, the fact that, in the face of a vehicular homicide investigation, he did not touch or sample the one item that appeared to be tissue or flesh makes little sense. McKinzie's next-day e-mail report to Ballinger described "fatty tissue" and concluded "it might be grease" and further "that this tractor did not hit a person." (Pl.'s Ex. 52 at 1). Further confounding McKinzie's account of events was that his official report, prepared in March 2010 for this suit, makes no mention of tissue and concludes that the examination of the truck's exterior and undercarriage "revealed no trace evidence of contacting a body." (Pl.'s Ex. 45 at 13).

Further, as a highly experienced former lawman working for a company implicated in a fatality accident, it defies common sense that McKinzie never took a statement from or even talked to Muthee about the accident. The illogic of McKinzie's testimony on this point is underscored by the fact that, at the very time McKinzie claims he never spoke to Muthee, he was acting as Knight's accident investigator, hired by Lee Baty, the very same lawyer who was representing Knight's driver George Muthee in connection with the accident.

Finally, McKinzie's demeanor and his argumentative and evasive manner of responding to straightforward questions severely undermined his believability. Moreover, his testimony was contradicted by other more credible witnesses and in many respects was simply not reasonable.

### iv.   Will Helton (by deposition)

Plaintiff next offered portions of the deposition testimony of Will Helton, who was driving the Hummer when it was struck. (II, 81). Helton's deposition was presented partially in question–answer format and partially via the video format of the deposition. It was, nonetheless,

compelling and credible in its detail of the horrific events that occurred during and after the accident.

Quoting from the transcript of Helton's deposition, as it was read and replayed for the Court at the evidentiary hearing, are the following relevant portions, which begin with Helton describing what he observed when he crawled out of the Hummer after the crash with Valek:

QUESTION: Well, let me ask you this way: Give me what sensations you had in terms of sound, force, feeling, what you sensed when this 18-wheeler, this red 18-wheeler came by.
. . . .

ANSWER [Helton]: I looked up from being in front of the Hummer. I looked because I saw lights coming, getting brighter. And I looked up, and the truck was (makes sounds) and I jump back, massive energy force, wind, major impact, major boom, crunch, splat. And as it . . . as it cleared the immediate impact area, it feathered its brakes, went 200 yards, stopped; hit the brakes and slowed down significantly; took his foot off the brakes, and you could hear (makes sounds).

QUESTION: Okay. And either . . . either in its headlights or when it hit its brakes, could you see Don anywhere in the road?

ANSWER [Helton]: No.

QUESTION: Okay. After it left, tell me what happened. I understand your shoes had been knocked off and you were walking . . . I think you testified that you . . . tell me what happened.

ANSWER [Helton]: Exactly what happened, after the truck left, I was pissed off. I knew that something wrong had happened. I was cursing, yelling down the road at the truck; walked out on the street to . . . around to the driver's rear door, kneeled down, pulled the bags off of Kelly.

I looked up. The truck is at this point in time just very distant. I was thinking, you know, this guy is going to come back, you know, and he never did. And there was no cars. There was no lights.

The dome light, which was on the ground, was lit so I could see Kelly's face. And then she was . . . blood all over her face. She was bent all the way over. I was pulling bags out, and I reached in as far as I could and grabbed her hand.

And I said, "You are going to be okay. It is okay. You are all right. It is okay." She says, 'Where's Don?'

I said, 'I don't know, but I'm going to go look for him . . . '

. . . .

And I continued to hold her hand; get up and start walking down the road, and I'm walking in guts, blood and guts. I could feel it between my toes with my socks on. And then I tripped over an object and in my . . . I have no shoes on, and there was glass, metal everywhere, but I hit a solid object.

I looked down and seen in the moonlight, I could see the outline, and it was Don's shoe, his white ankle sock, his leg up to the top of his thigh, and all of his muscles and nerves hanging out of it.

And I reached down and I touched it. And I was like, 'Oh, fuck,' is exactly what I said. At that point in time, I picked the leg up, and I'm . . . at this point in time, I'm in shock.

As I walked back toward the Hummer and toward Kelly, didn't know where Don landed, didn't know where he was at that point in time. All I saw was blood, guts and body parts. Walking back to the Hummer in the far right lane is when I saw the
lights of the other truck coming in, and I was like, oh, my God, here we go again.

But this truck geared down and makes sounds. You could hear the brakes. It would skid a little bit, grinding down the gears, it's all the way over. And it was hitting metal objects. It passed me by a large distance and then comes over to the right-hand lane and stops.

I walked back to Kelly and checked on her. I get back up, and I walk back over towards the truck that had stopped. The lady gets out of the truck and she is, 'oh, my God. Oh, my God. Call 911.' I was pissed off. I just didn't want to go over there, so I went back to Kelly.

Walking back to Kelly is when I see the headlights of the Lincoln and the guy, the silver-headed guy walking around out there. When his lights were on, I could see Jacob Valek's car, and I could see him, and he is just hanging out of the car dead. I didn't bother to go over to check on him because, frankly, I didn't even care.

I went back over to Kelly. While walking over to Kelly, looking around for Don, never saw him, his upper torso, and then go back to Kelly and that is when I kind of blank out.

The police officers come. And the first police officer says, 'Sir, are you okay?' And I remember saying, 'No, I'm not, I can't breathe. I don't know what is wrong with me.' And then I said, 'You guys need to go get this fucking truck that just left. Somebody just ran through here.'

. . . .

QUESTION: Let me stop you right there for a second, please, sir. Was this noise loud enough . . . a loud enough noise that it could have been easily heard by anybody?

. . . .

ANSWER [Helton]: Yes.

QUESTION: Like an explosion?

ANSWER [Helton]: Absolutely.

. . . .

QUESTION: . . . Is there any doubt in your mind that the truck that came through after you heard Don moaning was an 18-wheeler?

ANSWER [Helton]: Yes, no doubt in my mind.

QUESTION: Okay. Did any vehicle, between the time you heard Don's moaning, the time you heard this explosion and the 18-wheeler come through and leave the scene, did any other vehicle come through that could have struck Don?

ANSWER [Helton]: No.

QUESTION: Any question in your mind?

ANSWER [Helton]: There is no doubt in my mind.

QUESTION: Are you speculating on that?

ANSWER [Helton]: No. I know for a fact no other vehicle went through there.

. . . .

QUESTION: All right, let me stop you there. There were some questions that I think were intended to see whether this was Mr. Valek moaning or Don Ashton moaning, and here is my question to you: How long had you known Don?

ANSWER [Helton]: Since 2002; five years.

QUESTION: Did you know Don's voice?

ANSWER [Helton]: Oh, yes.

QUESTION: Did you know if this was Don or someone else moaning?

ANSWER [Helton]: It was definitely Don.

QUESTION: Any doubt in your mind?

ANSWER [Helton]: No doubt.[9]

---

[9] Helton later explained that he knew it was Don moaning because "Don has a very distinctive voice." (II, 105).

. . . .

QUESTION: From your physical sensation, including your auditory sensation, was Don alive?

ANSWER [Helton]: Yes, he was definitely alive.

. . . .

QUESTION: Is what you have described to us something you could easily forget?

ANSWER [Helton]: No, absolutely not. I replay it in my brain every day, every night. And of course I work at Firestone still, and every time that I see anything that references him, I can still hear the (makes noise), I can still see his leg. I can still feel . . . yeah. No. My memory of it is very clear.

(II, 85-89, 91, 101-02, 105-06).

Helton's video deposition testimony was remarkably strong. His demeanor, even viewed on the video tape, was of a credible individual with a vivid recollection of the horrific events surrounding the accident. Helton exuded anger, as opposed to confusion, as he described Muthee driving too fast through the debris field, causing an "explosion" and then slowing down but never stopping. His testimony established that Muthee not only drove at a reckless rate of speed through the site but also that it would have been highly unlikely that Muthee did not realize that he caused major damage to objects in the debris field.

v.    Roger Warren (by deposition)

After presenting Helton's deposition testimony, the Plaintiff offered excerpts from the deposition of Roger Warren, the Sedgwick County Regional Forensic Center Medical Examiner who responded to the scene of the accident on August 11, 2007. (*Id.* at 107). Warren interviewed Helton at the scene. (*Id.* at 108; Pl.'s, Ex. 43 at 10-11). Warren's deposition testimony, along with his report, composed at 4:30 am on August 11, 2007, established that Helton told him at the scene that Ashton was struck by Muthee's truck. (Pl.'s Ex. 43 at 10-11). Moreover, Warren's report itself

confirms that Helton told Warren that he saw Ashton struck by Muthee. (*Id.* at 10 (". . .Decedent struck by N. Bound semi which left the scene."); *id.* at 11 ("Witnesses report that the subject [Ashton] was then struck by a semi-tractor trailer.")). Warren's report states that "decedent" (Don Ashton) "may have been alive when struck by the missing semi truck . . . ." (*Id.* at 10). Warren also opined, during his deposition, that, based on his investigation, it was his opinion that "to a reasonable degree of medical probability" Don Ashton "was probably alive" before Muthee hit him. (II, 115-16).

According to deposition testimony offered by the Defendants, Helton told Warren later at the hospital that he was still inside the Hummer when Muthee's truck drove through the scene. (*Id.* at 111-12). This contradicted Helton's later deposition testimony that he was outside the Hummer when Muthee's truck drove through the scene. (*Id.* at 111-13). Nonetheless, Warren himself later explained, in response to questions during his deposition, that Helton could have been disoriented after treatment at the hospital when he told Warren he was inside the Hummer when Muthee's truck went through the scene. (*Id.* at 116-17).

The fact, as brought out by the Defendants, that Helton told Warren at the hospital after the accident that he was inside the Hummer at the time of Muthee's impact and later stated he was outside at the time of impact did not undermine the credible impact of Helton's testimony. Nor does it alter the consistent version of events from Helton, since he was interviewed at the accident scene, that Muthee's truck drove through the debris filed and hit Ashton.

<u>vi.</u>     <u>Discovery Issues</u>

Plaintiff's counsel closed their evidence with a presentation in support of their position that the Defendants had engaged in discovery abuses. First, Plaintiff's counsel maintained that they

sought, through formal requests for production: all documents regarding communications relating to the accident between Knight and it representatives and KHP, between Knight and the Republic County Attorney, between Knight and any other Kansas law enforcement agency, and between Knight and any federal law enforcement agency. (II, 122-23; Pl.'s Ex. 17). Plaintiff's counsel stated that he asked for these communications in July 2009, but that the Defendants did not produce them when they turned over other responsive documents. (II, 122-27). Instead, Plaintiff's counsel complained, the documents showing these communications and which unquestionably cast Knight in a unfavorable light, ultimately had to be obtained through Ballinger and other sources. (*Id.* at 125-27). Knight did not contest that this was how the documents had to be obtained.

Second, Plaintiff's counsel also stated they requested Muthee's driving records, including any driving violations, from the Defendants in July 2009. He stated that, despite Defendants' counsel's assurances that all responsive documents had been produced, that he did not get critical information responsive to this request from the Defendants until June 2010, on the eve of deposing Knight's safety director, Brett Sant, and that what he received, admitted as Plaintiff's Exhibit 19, was "unintelligible." (II, 128-30; Pl.'s Ex. 19). Counsel said it was not until Sant's deposition that he was able to obtain from Defendants a document, Plaintiff's Exhibit 22, showing that Muthee, in the hours and days preceding the accident, had been driving excess hours in violation of federal law and that Knight knew about the situation at the time, which was just prior to the Kansas accident. (II, 129-32; Pl.'s Ex. 22). It was not until after receiving this document, Plaintiff's counsel argues, that he was able to determine through Sant, that Knight was communicating with Muthee in the days preceding the accident and telling him to stop because he was driving over legally permissible hours. (II, 130-32). Knight did not dispute this sequence of events.

Finally, with respect to the Qualcomm communications between Muthee and Knight in the days and hours surrounding the accident, Plaintiff's counsel argued that the Defendants turned over some documents covering the 13th and 14th of August that were in an easily readable "screen shot" e-mail type format but produced nothing for the period of the 8th through the 12th. (*Id.* at 132-38; Pl.'s Ex. 26). After complaining to Defendants' counsel, the Defendants produced an excel-spreadsheet type document purportedly covering the 8th through the 12th which was in Plaintiff's counsel's words "indecipherable" in its format, triggering an acrimonious e-mail exchange reflected in Plaintiff's Exhibit 27. (*See* II, 133-36, 161-62). Ultimately, according to Plaintiff's counsel, the Defendants took the position that there were *no* communications between Muthee and Knight in the hours immediately surrounding the accident. As for the communications on August the 8th through the 12th, other than those immediately before and after the accident, Knight concedes it could have preserved them in the screen shot format, as it did for the 13th and 14th but did not. Knight's claims manager, Greg Williams, testified that his failure to preserve these screen shots was an "oversight" and agreed that the excel spread sheet format, unlike the screen shots, could be manipulated or edited.

B. *Defendants' Evidence*

i. Lee Baty

The Defendants' first witness (other than Robert McKinzie, who was called during Plaintiff's presentation of evidence for scheduling reasons) was Lee Baty, the attorney hired by Knight shortly after the accident. He said he was called by Knight a few days after August 17, 2007. (II, 172). Baty said that someone at Knight called him after the company had been notified by KHP that one of its trucks may have been involved in an accident. (*Id.* at 173). Baty said that he hired McKinzie within

a week after being retained by Knight. (*Id.* at 174). He said that in the week after he was hired, arrangements were made to fly McKinzie along with Baty's partner, Theresa Otto, to inspect the truck in California. (*Id.* at 174-75). He testified that he spoke by phone with Trooper Ballinger *before* the trip and told Ballinger about the trip and its purpose and told him that Knight would pay for Ballinger's trip but that Ballinger declined. (*Id.* at 175). He said he did not receive and was not aware of any objection or resistance on the part of Ballinger or KHP to Knight's private inspection of the truck. (*Id.* at 176-77).

As for Muthee, Baty said that Knight told him that Muthee was no longer an employee and could only be contacted by cell phone. (*Id.* at 177). He said he told Ballinger that he would try to make Muthee available for an interview but that because "Ballinger could not . . . travel to California" and because Muthee hired criminal counsel who would not permit him to return to Kansas, that the meeting never occurred. (*Id.* at 177-78). He said he never took any type of written or recorded statement from Muthee. (*Id.* at 179). And he said that Knight told him that the company had not taken any written statements from Muthee. (*Id.*).

On cross-examination, Baty conceded that he was not entirely sure whether he had communicated with Ballinger *before* McKinzie and Otto traveled to California in August 2007. (*Id.* at 191-92). He indicated that he knew there was a homicide investigation in progress in Kansas in connection with the accident when he authorized McKinzie's trip and inspection and testing of the truck. (*Id.* at 193-95). He said that he spoke with Muthee by phone after the accident but would not reveal the details of the conversation due to attorney-client privilege. (*Id.* at 202-03). Baty also said that he located and hired a criminal defense attorney for Muthee named Tom Haney. (*Id.* at 205-08). He agreed that throughout his discussions with Ballinger over the months following the

accident that he was acting as Knight's lawyer and for much of it he was acting as Muthee's counsel as well. (*Id.* at 204-05, 209). He testified at the evidentiary hearing that he was still representing Knight and Muthee. (*Id.* at 219). He said that he never disclosed to Ballinger that he was operating as Muthee's counsel. (*Id.* at 205, 239-40).

Baty agreed that the missing steer tires were key pieces of evidence but that he believed that Muthee thought he had the authority to order their replacement. (*Id.* at 213-15). He said his attorney-client relationship with Knight precluded him from addressing whether he spoke with Knight about authorizing the tire replacement. (*Id.* at 216). He testified that he tried to cooperate with Ballinger in his investigation but agreed that he filed a motion to quash a subpoena for documents from the State of Kansas in connection with their criminal investigation of Muthee. (*Id.* at 220-22).

Baty said Greg Williams, Knight's claims manager, hired him to represent Knight and it was Williams to whom he reported to in connection with the accident investigation. (*Id.* at 234-35). He stated that Williams told him that Muthee never contacted anyone at the company after the accident and instead left the truck in a parking lot in California. (*Id.* at 235-236). He agreed that the truck's removal from the accident site to the California yard impeded the investigation. (*Id.* at 237). He said he was told that Knight first learned about the accident on August 17th but that he did not know whether Knight had authorized the tire replacement before or after the work was done. (*Id.* at 237-238).

Baty, although positioned to know the details of key events, either disclaimed personal knowledge or claimed attorney-client privilege as to any material facts. He stood by Knight's dubious

story that Muthee never contacted the company after the accident and thereafter abandoned both his truck and his job only to have Knight hire Baty to represent him.

    ii.    Corey Paul

The next defense witness was Corey Paul, Director of Maintenance at Knight. (II, 243). He said he was familiar with TDS, the tire vendor Muthee had used in Sparks, Nevada. (*Id.* at 246-47). He said that the TDS facility was an authorized vendor for Knight. (*Id.*). He testified that Knight expects its drivers to obtain its authorization before getting tires repaired or replaced. (*Id.* at 248). He said the following information would be needed from the driver for Knight to authorize tire repair or replacement:

> Position, meaning what position tire it is on what piece of equipment, the equipment number, and what was happening to the tires in the case of this being a tire bank, if it was a previously re-treaded tire, that would have a different disposition than a un-retreaded tire, so we would want to know that

(*Id.*). He testified that he had no first-hand knowledge about Muthee's tire replacement but talked about standard operation procedures for obtaining approval from Knight for tire and other truck repairs. (*Id.* at 249-56).

On cross-examination, Paul agreed that, based on the information contained in Plaintiff's Exhibit 8, which was paperwork documenting the tire replacement, that Knight knew about the tire replacement on August 14th. (*Id.* at 256; Pl.'s Ex. 8). He testified that drivers must get approval from Knight before having their tires replaced by communicating with someone at Knight. (II, 257-258, 263). He said that approval was usually obtained in one of two ways; either by the driver calling Knight on the phone or sending the company a Qualcomm message. (*Id.* at 258-59). He said if the approval was by phone that a "repair order would be created." (*Id.* at 258). He said that the only

reason a driver would stop on a trip to have tires replaced instead of returning to Knight's offices is if the tires were "illegal to run." (*Id.* at 260-61). He agreed that Plaintiff's Exhibit 8 showed that Knight authorized the Muthee's tires to be "buffed-off and re-treaded." (*Id.* at 261-62). He agreed that Plaintiff's Exhibit 8 showed that on August 14, 2007, that "someone from Knight Transportation authorized the tread to be completely buffed off those tires." (*Id.* at 262). Finally, Paul agreed with Plaintiff's counsel that Plaintiff's Exhibits 57 and 8, oddly, showed Muthee's truck having less mileage at the time of the tire replacement on August 13, 2007 (111,111) than it had in June, 2007(192, 686). (*Id.* at 265-66).

Despite his status as a defense witness, Paul's testimony only reinforced Plaintiff's theory that Knight's settled policy for tire replacement or repair was to obtain company authorization in *advance* of the repair work. With his professed lack of personal knowledge about the facts of Muthee's repair, he added nothing to the defense theory that Knight did not authorize or even know about Muthee's tire replacement until after it was done.

iii.    Cory Staheli

The Defendants called Corey Staheli, Knight's Vice President of Information Technology, as their third witness. (III, 2). Staheli's testimony centered primarily on the electronic data stored by the company that reflected communications between Muthee and Knight for the critical period surrounding the accident, August 8, 2007, through August 13, 2007.

Staheli indicated that he was asked to provide the Qualcomm data showing electronic communications to and from Muthee's truck for August 8th through the August 13th but that the data no longer existed in a "print screen" format. (*Id.* at 3, 15, 24-26). Instead, he said that he had to retrieve the data from a tape and "export" it into an "excel spread sheet" format. (*Id.* at 3-6). He

said the data he retrieved was contained in Defendants' Exhibit 19. (*Id.* at 4-6). He could not explain why the data was not preserved in the more easily readable "screen shot" format of Defendants' Exhibit 18 instead of the excel format reflected in Defendants' 19 (Plaintiff's Exhibit 27A contains the same data as Defendants' Exhibit 19). (*Id.* at 20-22, 39-40, 56-57; Defs.' Exs. 18, 20). He testified that the stored electronic data in Defendants' Exhibit 19 showed no communications between Muthee and Knight for the night of August 10th and the early morning hours of August 11th, the critical period surrounding the accident. (III, 23).

On cross-examination, Staheli agreed that the screen shots for the relevant dates could have been preserved by printing them out within a year of their creation. (*Id.* at 26-27). He could not explain why, in the face of a request from KHP to preserve data within days of the accident, that the screen shots were not preserved. (*Id.* at 33-35, 38). He agreed again that the screen shots are in a much more readable format than the data that remains on the system after one year. (*Id.* at 30-31, 56-57). He also agreed that once the data contained on the screen shots is deleted that the excel spread sheet format in which it is retrievable can be manipulated and information deleted. (*Id.* at 45-46, 57). He conceded that he could not tell if the data presented in the excel spreadsheet format of Defendants' Exhibit 19 had been edited. (*Id.* at 45-48, 58).

As to Knight's truck repair policy, Staheli did, however, state that it is company policy for truckers involved in accidents to stop driving and report the accident to Knight's safety department or potentially lose their jobs. (*Id.* at 18-20). He also agreed that drivers must get company approval before getting tires replaced. (*Id.* at 65-67, 68, 70).

### iv.     Greg Williams

Greg Willams was the fourth defense witness. He stated that, as former Director of Claims for Knight, he was the first person in the company to be notified of a trucking accident. (*Id.* at 74-75). He testified he was notified by KHP that one of Knight's trucks may have been involved in an accident around six days after the accident. (*Id.* at 75-76, 78). He said he narrowed his search to Muthee. (*Id.* at 78). He indicated that he checked the Qualcomm system for communications from Muthee indicating he had been in an accident, but found none. (*Id.* at 78-79). He stated that he tried to reach Muthee but that Muthee did not respond to his calls. (*Id.*). He said he used the "Qualcomm positioning system" to locate Muthee's truck "in the L[os] A[ngeles] basin . . . area." (*Id.* at 79). He said that he sent two Knight employees out to retrieve the truck and return it to Knight's "Fontana California drop yard." (*Id.*). He said the truck was parked in the Los Angeles-area lot without its trailer. (*Id.* at 152).

Williams testified that a few days after the accident, he retained attorney Lee Baty to represent Knight and that Baty, in turn, hired McKinzie to investigate the accident. (*Id.* at 82-83). He claimed that he did not speak to Muthee at any time about the accident and did not know if Baty had spoken to him. (*Id.* at 85-86, 116, 140-41). Nonetheless, he stated that he hired Baty for Knight and Muthee. (*Id.* at 115, 154). He said he believed Baty "debriefed" Muthee about the accident but could not explain why, with Baty representing both parties, he was unable to interview Muthee. (*Id.* at 156-57). Nor could he explain, if he never talked to Muthee, how it was that Muthee gave his approval for Knight to hire and pay for a lawyer to represent him. (*Id.* at 155-56). He also had no justification for the fact that, instead of hiring a lawyer for Muthee, Knight did not simply fire him for violating company policy by leaving the scene of an accident, having unauthorized

repairs done to the truck, and abandoning his rig and job. (*Id.* at 158-59). He conceded this was the first incident he remembered where the company failed to obtain a statement from a driver involved in a major accident explaining what happened. (*Id.* at 140-42). He agreed that not attempting to obtain a statement from Muthee did not "look good" for the company. (*Id.* at 143).

Williams said he had been the designee in the company to handle vehicle damage repair issues. (*Id.* at 123). He said he would not approve damage repair without first knowing the cause. (*Id.* at 124). As for the repairs, Williams said in the days after the accident, he found company records indicating that Muthee had some repairs done to the truck. (*Id.* at 88-92). He could not explain why Plaintiff's Exhibit 8, the TDS document regarding Muthee's tire change, reflected the words "sold to Knight Transportation, attention Tracy Masterson" if the company did not authorize the replacement. (*Id.* at 129-31). Despite this, he said that he did not know who Masterson was and never tried to communicate with her about the issue. (*Id.* at 130-31). He later agreed on cross-examination that he could not say that Knight did not authorize the tire work *before* it was done and that such authorization before work was done was "proper procedure" at Knight. (*Id.* at 132).

Williams also said he was responsible for obtaining the Qualcomm screen shots requested in connection with the accident. (*Id.* at 94). He said that the fact that some of the shots were preserved while others, closer to the date of the accident, were not "may" have been an "oversight" on his part based on the fact that he had just been notified that his mother had cancer. (*Id.* at 94-96). Later, on cross-examination, Williams agreed that Ballinger had requested the Qualcomm data within days of the accident. (*Id.* at 111-12). He said that, although he knew the accident had occurred on August 11, 2007, and KHP was investigating the crash, and he began printing the screen shots on August 25, 2007, he did not print the screen shots for 8th through the 12th to

preserve them. (*Id.* at 112-14, 146-50). He agreed with Plaintiff's counsel that Knight had previously been the subject of scrutiny by another court for failing to properly preserve documents in connection with litigation, which resulted in a court permitting lawyer access to Knight's computers. (*Id.* at 104-08).

Williams, purportedly the key Knight staffer during the events surrounding the accident, had remarkably little to offer by way of substantive evidence. An overarching consideration for the Court when assessing Williams' credibility, is that he, as the company's claims manager, was recounting events relating to one of the most significant and likely rare events that occurs in the history of any national carrier—a major traffic fatality involving one of its trucks. His recollection should have been detailed and documented. Instead, he professed to have scant information about events that he likely personally directed as claims manager. For example, it was Williams who hired Baty for both Knight and Muthee, yet he could not provide a reasonable explanation as to why the company hired a lawyer for an employee who had essentially turned into a company "fugitive" after violating a series of its policies and triggering a criminal investigation against the company. (*Id.* at 158). Nor could Williams explain why he never even spoke to Muthee about what happened or why he did not simply fire Muthee for his malfeasant conduct. Williams did not even recall how long Muthee worked for the company, what his approved route was for the trip he was on at the time of the accident, or if he even completed the route before he left the truck at the Home Depot parking lot. (*Id.* at 134-43). Notably, Williams could not satisfactorily explain why he failed to preserve the critical Qualcomm screen shots for the days and hours immediately surrounding the accident other than to chalk it up to "oversight" caused by distraction over his mother's illness. Further, his unconvincing testimony that, as the very person who managed claims and repairs for Knight's fleet,

he had no first-hand knowledge about how or when Muthee's tire replacement was authorized was simply not believable. This is particularly so in light of the fact that the invoices reflect authorization by a Knight company employee, Tracy Masterson, and virtually every witness familiar with Knight procedures testified it was company policy that authorization *precede* repair work.

<u>v.</u>    <u>George Muthee (by deposition)</u>

Knight closed its evidence with George Muthee's deposition testimony. At his deposition Muthee testified that he felt a "jolt" while passing by the scene of the accident and that he slowed down and looked in his rearview mirrors but that he did not see anything wrong. (III, 161-62, 170). He stated that he stopped a mile down the road from the scene to inspect his vehicle because he could not have safely pulled over prior to that point. (*Id.* at 174-76). He said that "looking back" he would and could have stopped after he felt the jolt. (*Id.* at 177-82). He conceded that, although he drove through the accident scene on August 11, 2007, that he falsified his drivers logs to show otherwise. (*Id.* at 172). He claimed that he did not hit Don Ashton. (*Id.* at 165). After he pulled over, Muthee stated that he got out of the tractor, inspected it with a flashlight, and saw that the three-by-seven foot piece of fairing was missing from his truck. (*Id.* at 162-64). Muthee explained that he did not return to the scene even after he felt a jolt while passing through and saw that the truck was damaged, because the missing piece had come off a week before. (*Id.* at 162-63).

He said he got the tires replaced because of "tread separation." (*Id.* at 161, 185). He conceded that there was no entry on his drivers log, as required, documenting the tread separation and that he was getting the tires replaced. (*Id.* at 185-87). He stated he did not know why he did not make the entry on his driver's log that he stopped in Sparks, Nevada, to get the tires replaced or why he instead made an entry that he was in Wyoming at the time. (*Id.* at 187-88). He said he

was aware of his responsibilities to keep accurate and timely driver logs and that he was required to update the logs every time his "duty status" changed and to forward the logs to the carrier. (*Id.* at 167-68). Muthee claimed that *he* authorized the tire replacement. (*Id.* at 188-89). He said he never filled-out an in-house accident report form for Knight or told anyone about what happened regarding the accident. (*Id.* at 189, 191). He testified that Knight never asked him what happened to his truck, with the three-by-seven piece of fairing missing. (*Id.* at 189-90). Muthee further stated that he did not know why the tire replacement invoice reflects that Knight paid for the work. (*Id.* at 193-95).

He claimed he did not remember the date he left the truck in the Home Depot parking lot. (*Id.* at 190-91). He said he found out the truck had been picked up by Knight when "a lawyer" left him a phone message. (*Id.* at 191-92). He said he did not know who the lawyer worked for or even his name. (*Id.* at 192-93). He further said that he did not know how the lawyer even knew to call him to tell him about the truck. (*Id.* at 195-96).

Muthee's testimony was simply not believable. It was neither reasonable nor compatible with known facts. His explanation for not stopping and returning to the accident scene, even though he felt a "jolt" as he drove through the site and saw, within a mile down the road, that part of his truck had been torn off, was flimsy at best. If, as he claimed, he did not turn around and go back because the fairing had come off a week earlier, he never suitably justified why he would leave a large portion of his employer's truck on the side of the road without telling the company. His story that he fled the scene of the accident, abandoned a portion of his truck on the road, left the state, falsified his driver logs, and authorized his own tire replacement, without telling the company, all in violation of settled company policy, only to have the company hire a lawyer for him—whose name

he could not remember—makes little sense. Instead, Muthee's testimony appeared contrived and offered no credible support for the Defendants' version of events.

C.      *Conclusions from the Evidence*

Summing up, Plaintiff's allegations of spoliation concern two sets of evidence: the truck and its tires, as they appeared immediately after the accident, and the Qualcomm communications from the hours and days immediately surrounding the accident. While there is no direct evidence establishing that the Defendants intentionally destroyed or altered these pieces of evidence, there is a wealth of circumstantial evidence in this regard. It is the sheer strength of this circumstantial evidence, considered in the aggregate, that leads the Court to the inescapable conclusion that the Defendants engaged in spoliation as to these two sets of proof.

Witness credibility weighed heavily in the Court's factual determinations. The opportunity to closely observe each witness's demeanor as they answered questions over the course of the three-day evidentiary hearing significantly aided in the Court's resolution of disputed facts. For the most part, Plaintiff's witnesses were more credible and their factual accounts more reasonable than the Defendants' witnesses. In fact, the obvious lack of candor by certain of the defense witnesses was quite troubling to the Court, as portions of the record reflect.

The strong chain of circumstantial evidence supporting the Plaintiff's allegations of spoliation begins on the night of the accident. It is abundantly clear from Helton's compelling video deposition that he watched, horrified, as Muthee drove through the accident debris field at a high rate of speed causing what Helton described as a "massive energy force" and "major impact." Helton credibly described his anger as he watched Muthee drive through, causing what sounded like an "explosion," slow down and stop, and then drive away from the scene. Helton told police who arrived at the

scene that they needed to "go get" the truck that had just run through the scene. Helton heard Don Ashton moaning before Muthee drove through but not afterwards. Dr. Roger Warren's deposition testimony and report corroborated Helton's testimony that Ashton was alive before he was hit by the eighteen wheeler**.** Muthee no longer denies that his truck "contacted" Don Ashton when he drove through the debris field or that the "contact" ripped the fairing from his truck. Yet he left the scene and the state and falsified his driver's log to show he was in Nebraska in his sleeper's berth at the time of the accident. From all of these facts, an inference can be drawn that Muthee, knowingly fled the accident scene to escape potential liability for himself and Knight.

It is irrefutable that with each mile Muthee drove from the accident site, the quality of the evidence on the truck and its tires diminished. Moreover, the further Muthee drove, the more he hampered the ability of accident reconstruction experts to determine what happened and to assign fault for Ashton's death. Even McKinzie agreed that Muthee's fleeing the scene, besides being illegal, deprived investigators of optimal evidence gathering and accident reconstruction capabilities. Muthee, of course, was aware of this matter of basic common sense when he drove 1,400 miles to Sparks, Nevada, and had the steer tires replaced.

Exactly *when* Knight was notified of the accident is not established by the direct evidence. But there are several pieces of circumstantial evidence that, when combined, strongly support an inference that Knight was well aware of the accident before Muthee had the tires replaced and was, in fact, the driving force behind the tire replacement. Showing that Knight knew about the accident before the tire replacement is an important piece of the Plaintiff's puzzle because, if true, it shows that Knight was behind the destruction of a key piece of unfavorable evidence. The company's theory that it was first told of the accident by KHP and was not aware of Muthee's conduct until

after he authorized the tire replacement and then abandoned the truck at the Home Depot lot in California is not believable for several reasons. First, it was Knight's policy that truck drivers notify it of accidents as soon as they occur or face losing their jobs. Muthee was involved in a major traffic fatality and part of his truck was missing, purportedly on the roadside in Kansas, and he supposedly had the tires replaced without company authorization. Not only was Muthee *not* fired over these incidents, Knight hired a lawyer for him even before they retrieved his truck from the Home Depot parking lot. Baty's stalling and later failure to make Muthee available to KHP, as reflected in the series of e-mails in Plaintiff's Exhibit 52, only reinforces the inference that Muthee and Knight were in cahoots before the tires were replaced.

Another indicator that Knight was notified about the accident before the tires were replaced relates to the missing Qualcomm communications for the period surrounding the accident. Muthee had the Qualcomm communication system in his truck that he had been using regularly in the days leading up to the crash.[10] Mysteriously, the Qualcomm records showing communications for the days and hours surrounding the accident were not preserved by Knight, despite a written request from KHP on August 25, 2007, that the records be saved and produced. Greg Williams, Knight's claims manager, had no credible explanation for not preserving these records for the 8th through the 12th of August, 2007. Even though he *did* preserve the screen shots for August 13th through the 17th, Williams said "oversight" must have been the cause for not saving them for the 8th through 12th. Williams testified that the company has one year to preserve the Qualcomm screen shots before they are deleted automatically, on a system-wide basis. What that means for purposes of this

---

[10] He also had a cell phone that was missing its back cover and SIM card in the pictures taken by McKinzie and that later disappeared from his truck as it sat in the Fontana yard for several months.

discussion is that, in the year leading up to the automatic deletion of the screen shots, while Ballinger and KHP were pressuring Knight with requests for evidence, Knight never once took action to preserve them. Williams' obvious hedging on this point completely undermined his credibility. To suggest that he inadvertently failed to preserve key communications between Muthee and Knight, when he *did* preserve them for other dates, and in the face of a criminal investigation and a written request by a law enforcement agency, was not credible and supports a strong inference that the missing screen shots contained relevant evidence—now altered—that was unfavorable to the Defendants.

What was finally produced, after considerable delay by Knight and complaints by Plaintiff's counsel, were the almost unintelligible spread sheets that Knight admitted could be edited and manipulated. Curiously, the spread sheets, Plaintiff's Exhibit 27, show *no* communications between Knight and Muthee from approximately 11:00 pm on the 10th of August through 6:45 am on August 11th, the hours immediately surrounding the accident.[11] Odder still, is that the spread sheets show two messages from Knight to all drivers, including Muthee, one on August 10th and the other on August 11th, to "stay safe" and telling the drivers to "update their hours." For August 10th , the spread sheets also show a message directly from Knight to Muthee stating: "[G]eorge, you also drove entirely too far over your hours . . . this is not good. [Y]ou know the hours of service, we must

---

[11] At the evidentiary hearing, Defendants attempted to explain this gap with the testimony of Corey Staheli, who stated that the gap in communications did not seem out of the ordinary to him because drivers cannot send Qualcomm messages while they are driving. (III, 17-18). However, from the testimony offered by both parties, it appears clear that Knight can send Qualcomm messages *to* a driver while the driver's tractor is moving. In fact, Plaintiff's Exhibit 27 shows at least one instance in the period surrounding the accident where Knight sent a message while Muthee was driving. (*See* Pl.'s Ex. 27, message sent on 200/72/21 (August 9th) at 4:56:08 warning Muthee of driving conditions on his route: "I-70 East & West Exit 209, Bunkerhill area is shut down due to wreck & tanker explosion. All traffic being routed around that area. KC safety.").

maintain safe and legal driving. [B]oth you and the company have too much to lose by driving outside of the hours of service regulations. [Y]ou need to get your 10 hr break . . . ." Despite these purported admonishments about safety, not one mention is made in any of the spread sheet data or the Qualcomm data that *was* preserved about Muthee's accident. Even Williams conceded that this turn of events did not "look good" for the company. Further undermining William's "oversight" excuse was his concession that he had been the subject of prior court orders in other cases for the same questionable conduct while working for Knight. Given this suspicious conduct surrounding the missing Qualcomm data, the Court finds a second reasonable inference can be drawn that the Defendants' assertion that there were no communications on the Qualcomm system—between Muthee and Knight between 11:00 pm on the 10th of August through 6:45 am on August 11th—is not true.

     A particularly strong indicator that Knight knew about the accident before Muthee had the tires replaced derives from the facts surrounding the authorization for the repair work. Witness after witness, for both sides, testified that it was Knight's settled policy that repair work be authorized by the company in *advance* of the work. Muthee and Knight's claim that Muthee drove 1,400 miles from the accident with a piece of his truck missing and pulled into the TDS facility in Sparks, Nevada, where he not only self-authorized the almost $700 in repair work but also persuaded the TDS employee to do the work without contacting the company does not comport with the reality of Knight's policies or common sense. Corey Paul, Knight's Director of Tires, unequivocally agreed authorization must precede work and that—to trigger authorization—the driver is to contact Knight through the Qualcomm system or by a phone call. (II, 257-59). The Defendants attempted to rely on the paperwork evidencing Knight's authorization on August the 14th, Plaintiff's Exhibit 8, as

proof it was approved after-the-fact. But the paperwork did not indicate the work was not authorized before it was generated and Paul's clear testimony was that the driver must get approval—either by phone or e-mail—in advance of the work. And not one witness with first-hand knowledge came forward to testify precisely when the company was first notified of the repair work. Even Greg Williams, the very person in the company who was to be notified of accidents and repair work, disclaimed personal knowledge of how or when the company was notified of the repair work. It defies common sense that TDS would incur the expense—particularly on this damaged truck—without certainty from Knight that TDS would be paid.

Another curious factor that lends credence to Plaintiff's theory that Knight was involved in the tire replacement is the fact that there is no documentation—as required by company policy—that the tires needed changing, at *that* point in time. Corey Paul testified that the only reason that Muthee would need to have the tires replaced in Nevada instead of waiting until he returned to California was if his tires were "illegal to run." (*Id*. at 260). But there is not only no documentation showing that his tires were illegal to drive on, there is not even a shred of written support at all to substantiate Muthee's testimony that the tires had "tread separation." Moreover, the TDS invoice, shows that the truck had been in an "accident." (Pl.'s Ex. 8 at 4). In the end, and perhaps most significant to this chain of events, is that the two front steer tires, which the experts agreed were critical pieces of evidence in an accident investigation, no longer exist. And the fact that Muthee could not have authorized the replacement without notifying Knight in advance, provides another inference that Knight was behind the replacement and, consequently, complicit in the destruction of evidence relating to the accident.

This circumstantial evidence that Knight was aware of and likely directing Muthee's actions before he had the tires replaced is even more compelling when considering the events that occurred after the truck was retrieved and returned to the Fontana yard. By the time the truck was retrieved, Knight had already hired counsel for Muthee and a private investigator for itself and directed them to inspect the truck. McKinzie's motives in inspecting and testing the truck before KHP, as mentioned above, are suspect. First, his access to the truck before KHP was highly irregular as Ballinger testified and McKinzie conceded. McKinzie was not truthful, in this Court's view, when he stated he had KHP's full authorization to tamper with the truck. The fact that he took samples directly from the truck and sent them for private testing after the attorney with him told Christopher Sandberg that there was "flesh" underneath the truck, is more evidence that McKinzie, on Knight's behalf, was intentionally compromising evidence unfavorable to Knight and Muthee. McKinzie's next-day e-mail to Ballinger stating that he did not think the truck had struck a human and that "these folks" at Knight would cooperate is more proof of this same nefarious intent. Also, the fact that the truck was placed in the yard partially exposed to the elements and where the mud flap and tail light, potentially significant pieces of evidence, were removed, further strengthens the inference of spoliation against Knight and Muthee. Adding to the inference is Sandberg's sudden firing by Knight, after eight years with the company, soon after he told the Ontario police about the condition of the truck, including that McKinzie had inspected the truck and that the mud flap and tail light were missing. As he credibly testified, he was told by a Knight employee that he "talked too much" in explanation for his termination.

The foregoing circumstantial evidence that Knight and Muthee collaborated on the destruction of evidence against them is further fortified by the credible evidence of Knight's failure

to cooperate with Ballinger and KHP in spite of their promises to the contrary. Read in a vacuum, even without considering the foregoing circumstantial evidence against the Defendants, the series of e-mails, contained in Plaintiff's Exhibit 52, chronicle a startling pattern of intentional evidence obstruction by the Defendants. The e-mails reflect Ballinger's multiple attempts to obtain records and information from Knight through Baty only to be stonewalled by Knight. Moreover, when Ballinger was finally able to get Muthee's driver log from Knight, it turned out to have been falsified—showing Muthee asleep in Nebraska during the accident.

This problematic conduct has continued through the discovery phase of this case. As mentioned, the Defendants did not preserve the screen shots of the Qualcomm communications between Knight and Muthee for the days and hours surrounding the accident. This, despite their knowledge of the accident and a request by KHP for those precise records. What was produced, albeit late, was the unintelligible excel spread sheet, which by all accounts could be edited and deleted. Additionally, despite a request in July 2009, the Defendants failed to produce, until June 2010, during the deposition of Knight's safety director, the driver violation records of Muthee. The records showed that Muthee had been driving in violation of legally permissible hours in the days leading up to the crash and that Knight was aware of this fact *before* the accident. Finally, the Defendants wholly failed to produce the e-mail communications by Ballinger, reflected in Plaintiff's Exhibit 52. In the face of this and all of the foregoing facts, it is beyond belief that there were no Qualcomm communications in the hours leading up to and immediately following the accident. The Defendants' discovery conduct, standing alone, is very troubling. Combined with the mountain of other questionable conduct, a disturbing picture emerges of a planned and orchestrated attempt by Knight and Muthee to hide and destroy evidence of their involvement in the accident. In short, the

proof is overwhelming that the destroyed evidence on the truck and tires and contained in the missing Qualcomm data was relevant and highly unfavorable to the Defendants.

## IV.

## LEGAL STANDARD

A federal court has the inherent power to sanction a party who has abused the judicial process. *Chambers v. NASCO*, 501 U.S. 32, 44 (1991). The spoliation of evidence is one such abuse. *Rimkus Consulting Group, Inc. v. Cammarata*, 688 F. Supp. 2d 598, 611 (S.D. Tex. 2010). Spoliation is the "destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001) (citing *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999)); BLACK'S LAW DICTIONARY 1531 (9th ed. 2009). Destroying or altering evidence, however, does not necessarily mean that the party has engaged in sanction-worthy spoliation. Instead, the Court must first find the existence of a duty to preserve the information, a culpable breach of that duty, and resulting prejudice to the innocent party. *Rimkus*, 688 F. Supp. 2d at 612, 615-16; *Victor Stanley v. Creative Pipe, Inc.*, 269 F.R.D. 497, 520-21 (D. Me. 2010). The party seeking the spoliation sanction bears the burden of proof. *Rimkus,* 688 F. Supp. 2d at 615-16. Federal law governs spoliation issues in diversity suits. *Condrey v. Suntrust Bank of Georgia*, 431 F.3d 191, 203 (5th Cir. 2005).

A duty to preserve arises when a party knows or should know that certain evidence is relevant to pending or future litigation. *Rimkus,* 688 F. Supp. 2d at 612 (quoting *John B. v. Goetz,* 531 F.3d 448, 459 (6th Cir. 2008)); *Toth v. Calcasieu Parish*, 2009 WL 528245 at * 1 (W.D. La. Mar. 6, 2009 (citing *Zubulake v. UBS Warburg, L.L.C.*, 220 F.R.D. 212, 216 (S.D.N.Y.2003)). Once

litigation is reasonably anticipated, a potential party to that litigation "'must not destroy unique, relevant evidence that might be useful to an adversary.'" *Toth*, 2009 WL 528245 at * 1 (quoting *Zublake,* 220 F.R.D. at 216). The duty to preserve extends to the party's or potential party's employees "likely to have relevant information—the 'key players.'" *Id.* The duty to preserve evidence is a duty owed to the *court*, not to the party's potential adversary, hence, spoliation is considered an abuse of the judicial process. *Victor Stanley*, 269 F.R.D. at 525-26.

Courts have not been uniform in defining the level of culpability—be it negligence, gross negligence, willfulness, or bad faith—that is required before sanctions are appropriate for evidence destruction. *Id.* at 529-31; *Rimkus*, 688 F. Supp. 2d at 613 ("Culpability can range along a continuum from destruction intended to make evidence unavailable in litigation to inadvertent loss of information for reasons unrelated to the litigation."). Nonetheless, an in-depth discussion[12] of the varying levels of blameworthiness required to trigger sanctions for spoliation is not necessary here for two reasons. First, the Court is proceeding pursuant to its inherent authority, which is necessarily confined "to instances of bad faith or willful abuse of the judicial process."[13] *Pressey v. Patterson*, 898 F.2d 1018, (5th Cir. 1990). Second, Plaintiff seeks an adverse inference jury instruction or the striking of Defendants' pleadings for their conduct in this case, both of which require a showing of

---

[12] For an exhaustive circuit-by-circuit review, complete with comparison charts, see *Victor Stanley*, 269 F.R.D. at 525-26, 543-53.

[13] Recognizing the exclusivity of its inherent authority, which is to be invoked only when "no sanction established by the Federal Rules or pertinent statute is 'up to the task,'" this Court, nonetheless, resorts to its inherent powers in this instance based upon the nature and timing of the underlying allegations. *Rimkus*, 688 F. Supp. 2d at 611-12, 613 (quoting *Chambers*, 501 U.S. at 43-46);*Victor Stanley*, 269 F.R.D. at 518-20. Specifically, as opposed to the multitude of cases involving post-filing document destruction, where the sanctioning courts have relied on Fed. R. Civ. P. 37(b), the bulk of the conduct under consideration here occurred pre-filing before the discovery rules and their attendant sanctioning provisions applied. *Rimkus*, 688 F. Supp. 2d at 612.

bad faith on the part of the Defendants. *King v. Ill. Cent. R.R.*, 337 F.3d 550, 556 (5th Cir. 2003) (stating that a party seeking sanctions must show adversary "acted in 'bad faith' to establish entitlement to an adverse inference."); *Rimkus*, 688 F. Supp. 2d at 614.

The term "bad faith" has been described as conduct involving "fraudulent intent and a desire to suppress the truth." *Consolidated Aluminum Corp. v. Alcoa, Inc.*, 244 F.R.D. 335, 344 (M.D. La. 2006). Another court described "bad faith" as "destruction for the purpose of depriving the adversary of the evidence." *Victor Stanley*, 269 F.R.D. at 530 (quoting *Powell v. Town of Sharpsburg*, 591 F. Supp. 2d 814, 820 (E.D. N.C. 2008)). The Fifth Circuit has instructed that an adverse inference jury instruction for spoliation is appropriate where a showing is made that the malfeasant party "intentionally destroy[ed] important evidence in bad faith [and] did so because the contents of those documents were unfavorable to that party." *Whitt v. Stephens County*, 529 F.3d 278, 284 (5th Cir. 2008) (quoting *Russell v. Univ. of Tex.*, 234 F. App'x 195, 207 (5th Cir. 2007)). Allowing that there are myriad scenarios involving allegations of evidence destruction, one legal certainty, in the Fifth Circuit, is that "the circumstances of the act [of spoliation] must manifest bad faith" before severe sanctions are available. *Vick v. Texas Employment Comm'n*, 514 F. 2d 734, 737 (5th Cir. 1975).

In order to satisfy the prejudice requirement, the party seeking sanctions must demonstrate that the missing or altered evidence would have been relevant to her case. *Rimkus*, 688 F. Supp. 2d at 616. "[L]ost or destroyed evidence is 'relevant' if a 'reasonable trier of fact could conclude that the lost evidence would have supported the claims or defenses of the party that sought it.'" *Victor Stanley*, 269 F.R.D. at 531 (quoting *Thompson v. U.S. Dep't of Housing & Urban Dev.*, 219 F. 3d 93, 101 (D. Me. 2003)). Prejudice to the non-culpable party can range from an utter inability to prove

claims or defenses to minimal effects on the presentation of proof. *Rimkus,* 688 F. Supp. 2d at 613. Generally, the prejudice element is satisfied "where a party's ability to present its case or to defend is compromised." *Id.* at 532. At the same time, courts must be careful that the application of this burden is not too onerous, otherwise the spoliating party might be allowed to profit from its own misconduct. *Rimkus,* 688 F. Supp. 2d at 616.

Courts have broad discretion in crafting a remedy that is proportionate to both the culpable conduct of the spoliating party and resulting prejudice to the innocent party. *Anadarko Petroleum Corp. v. Davis,* No. H-06-2849, 2006 WL 3837518, at *27 (S.D. Tex. Dec. 28, 2006). These sanctions include awarding attorney's fees, deeming certain facts admitted, giving an adverse inference instruction to the jury, striking pleadings, entering a default judgment, and dismissing the case entirely. *Rimkus,* 688 F. Supp. 2d at 618-19; *Duque v. Werner Enters., Inc.,* No. L-05-183, 2007 WL 998156, at *2-3 (S.D. Tex. Mar. 30, 2007). In choosing the appropriate remedy, a court must ensure that it is "no harsher than necessary to respond to the need to punish or deter and to address the impact on discovery." *Rimkus,* 688 F. Supp. 2d at 618. In other words, an appropriate sanction should "(1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore 'the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party." *West v. Goodyear Tire & Rubber Co.,* 167 F.3d 776, 779 (2d Cir. 1999) (quoting *Kronisch v. United States,* 150 F.3d 112, 126 (2d Cir. 1998)); *Victor Stanley,* 269 F.R.D. at 533-34. A court should also consider "whether the sanctions it imposes will 'prevent abuses of the judicial system' and 'promote the efficient administration of justice.'" *Victor Stanley,* 269 F.R.D. at 539 (quoting *Jones v. Bremen High School Dist. 228,* No. 08 C 3548, 2010 WL 2106640, at * 5 (N.D. Ill. May 25, 2010)). And as

mentioned, the more severe sanctions, such as granting default judgment, striking pleadings, or giving adverse inference jury instructions, are available only upon a showing of bad faith conduct. *Id.* at 614.

**V.**

**ANALYSIS**

A.     *Duty To Preserve*

There can be little debate that Knight and Muthee had a duty to preserve the truck and its tires in the condition that they existed immediately after the accident.  Nor can there be much dispute that litigation was reasonably foreseeable at the time Muthee left the fatality accident site or later when Knight and Muthee arranged to have the tires replaced. The truck and tires were unique, irreplaceable pieces of evidence, critical to determining the degree of the Defendants' fault for Ashton's death.  Indeed, Knight itself understood the need to act swiftly to preserve evidence on the truck, as evidenced by its hiring of McKinzie within days of the accident to conduct inspection and testing on the truck.  *See Silvestri*, 271 F.3d at 591 (plaintiff's prompt retention of reconstruction expert demonstrated knowledge of duty to preserve).

As for the Qualcomm communications, the fact that they were the primary communications between Muthee and Knight during the hours and days surrounding the accident should have put Knight, or any national carrier, on notice that this data would be highly relevant evidence in upcoming litigation.  This, and the fact that Ballinger asked Knight in writing to preserve these messages within days after the accident, unquestionably establishes both that litigation was reasonably anticipated and that Knight had a duty to preserve the communications.  Accordingly,

when Knight failed to preserve the Qualcomm data and deleted the data for the hours surrounding the accident, the company violated its duty to preserve.

B. *Bad Faith*

The facts and circumstances surrounding the Defendants' destruction of the truck and its tires and the Qualcomm data "manifest bad faith." *See Vick*, 514 F. 2d at 737. Contrasted with the typical spoliation scenario where determining the spoliator's culpability level turns upon the nuances of a company's document retention policy, here there are no such subtleties. Muthee's flight from the accident scene and Knight's hasty replacement of the truck's tires are the epitome of bad faith conduct. Surely Muthee, a professional truck driver, knew that fleeing the accident scene not only violated the law but would necessarily thwart evidence recovery efforts on the truck. Likewise, Knight's replacement of the truck's tires within two days of the fatality accident, after its driver fled the scene and the state, cannot seriously be labeled anything less than intentional conduct.

Lastly, Knight's failure to preserve key Qualcomm messages, in the face of a request to produce and preserve by a law enforcement agency, also strongly evinces bad faith. Williams' derogation of his responsibility to preserve the only pure communications data for the days and hours surrounding the accident lends itself to no other explanation. As mentioned, at any point in time over the year before this data was automatically deleted by the system, Williams, who was being regularly pressured for the data by KHP, could have simply printed the screen shots and saved them. Inexplicably, he did not. Instead, Knight belatedly supplied the spread sheets, which by Williams'

own admission, can be edited and which, oddly, contain not one iota of discussion between Knight and Muthee about the major fatality accident or the repair work.

When considered in the context of all of Defendants' other questionable post-accident conduct, the evidence is clear and convincing that the Defendants, purposefully, over a sustained period of time, engaged in a concerted effort to hide and destroy evidence. To cite to just a few of the fact—Knight's storage of the truck in the wind and sand-swept drop yard; McKinzie's private inspection and testing of the truck before KHP; Knight's hiring of Baty for Muthee before the truck was even returned; Baty's refusal to submit Muthee for a post-accident interview; the stonewalling of KHP's request for documents; Knight's firing of Sandburg because he "talk[ed] too much;" the false driver logs Knight turned over to Ballinger; the questionable delays and failures to produce key evidence in this case; and, finally, the obvious prevarication by the Defendants' witnesses during the spoliation hearing—all make clear that the Defendants engaged in spoliation and did so in bad faith.

C.    *Prejudice*

Muthee and Knight's bad faith actions[14] materially "compromised" Plaintiff's "ability to present [her] case." *See Victor Stanley*, 269 F.R.D. at 532. First and foremost, without access to the truck and tires in their post-accident state, Plaintiff has no direct, physical evidence to prove that Muthee's vehicle was the one that struck Don Ashton. Instead, the only pieces of evidence Plaintiff is able to rely upon are the testimony of Will Helton that he saw the truck drive through the site and no longer heard Don Ashton moaning afterwards and the fact that Muthee's fairing was left at the

---

[14] It bears noting that the Court is not imputing Muthee's bad faith in fleeing the accident scene to Knight by virtue of their employer/employee relationship. "Bad faith is personal" not to be "automatically [] visited on others." *Wolters Kluwer Fin. Servs., Inc. v. Scivantage*, 564 F.3d 110, 114 (2d Cir. 2009). Instead, the Court, as addressed in detail above, finds that the evidence establishes that Knight became involved in the bad faith destruction of evidence at some point after the accident and before the tire replacement.

accident scene. From the start, the Defendants have attacked the validity and sufficiency of this evidence, arguing as recently as their summary judgment briefing that "despite extensive investigation, discovery, and the expiration of the deadlines to designate experts, there is simply no competent evidence of any contact whatsoever between Muthee's vehicle and Ashton's body." (Defs.' Mot. Summ. J. 8). In other words, Defendants have contended that there is "no direct evidence that Muthee's vehicle struck Ashton." (*Id.* at 11-12).

While the Court found that Helton's testimony and the displaced fairing sufficiently raised a fact question to which a reasonable jury *could* find for Plaintiff in refusing to grant summary judgment, whether a particular jury *would* find for Plaintiff on such indirect evidence alone is an entirely different matter. By being deprived of the truck and tires and thus any direct evidence of Muthee's contacting Ashton, Plaintiff's ability to prove that Muthee's vehicle was the one that struck Don Ashton, an essential fact for recovery, is severely curtailed. Adding to the prejudice and underscoring the obvious relevance of this missing evidence, is McKinzie's expert report, where he opines that, based on his private inspection of the truck, Muthee's vehicle did not strike Don Ashton. (*See* Pl.'s Ex. 10 at 2). Because of Defendants' destruction of this key evidence, it is even less likely that Plaintiff will be able to prove that Muthee caused her death, and, for this, she has suffered substantial prejudice.

Knight's failure to save or produce the screen shots of Muthee's Qualcomm messages has also prejudiced Plaintiff. The Court has already found that the circumstantial evidence of Defendants' misconduct demonstrates that the Qualcomm messages between Muthee and Knight in the hours and days immediately surrounding the accident were likely deleted or altered. Because of this, Plaintiff and this Court will never know the precise content of the deleted communications. The

screen shots cannot be replaced in their original non-editable format. As mentioned above, the spread sheets and Qualcomm screen shots that *were* produced show communications about driver safety, including one quite lengthy admonishment to Muthee about safe driving on August 10th. One would naturally expect the Qualcomm system, as the key means of communication between Knight and its drivers, to contain some immediate post-accident messaging between Knight and Muthee. Knight's policy, as is likely with all national carriers, required immediate notification of accidents by the drivers involved. Failing to follow this policy could result in termination. Nonetheless, according to Knight, there were *no* Qualcomm communications of this nature in the hours immediately surrounding the accident and none at all about Muthee's involvement in a fatality accident in Kansas or the subsequent tire replacement.

In sum, the totality of the circumstantial evidence surrounding the Defendants' actions, as recounted in detail throughout this opinion, would permit a reasonable fact finder to conclude that the missing evidence would have aided Plaintiff in proving her claims. *See Rimkus*, 688 F. Supp.2d at 616-17.

D.      *Proper Sanction*

Having determined that Defendants had a duty to preserve the physical evidence on the truck and tires and the Qualcomm messages from the hours surrounding the accident, that Defendants breached that duty in bad faith, and that Plaintiff thereby suffered prejudice, the lone matter remaining for the Court's consideration is fashioning the proper sanction. As discussed above, the court must determine which sanction best (1) deters parties from future spoliation, (2) places the risk of an erroneous judgment on the spoliating party, and (3) restores the innocent party to their rightful litigation position. *See Victor Stanley*, 269 F.R.D. at 533-34.

Restoring Plaintiff to the litigation position she would occupy absent the spoliation requires removing the evidentiary obstacles caused by the spoliation. If not for Defendants' spoliatory conduct, the Plaintiff would have direct, physical evidence that Muthee's vehicle struck her husband. Thanks to Defendants, this evidence has disappeared. Therefore an instruction by the Court to the jury that Muthee's truck struck Don Ashton's body is minimally called for as a sanction here. At the same time, merely deeming Muthee's striking of Ashton as admitted, does not go nearly far enough to level the playing field. The missing evidence—the truck and its tires and the Qualcomm data—for all of the reasons cited above is assumed to be highly unfavorable to Knight and Muthee. On its own, the instruction that Muthee struck Ashton does not carry the nearly evidentiary weight of the missing inculpatory evidence that was contained on the truck, its tires and in the Qualcomm data. Nor, if presented as the sole substitute for the missing evidence, does this instruction by the Court afford Plaintiff the opportunity to present the overwhelming evidence of the Defendants' bad faith attempts to hide their involvement in the accident.

The Defendants' attempts to conceal their involvement in the accident are highly relevant both to liability and potential damages. Indeed, the Defendants are well aware of this truth. Having failed in their attempts on summary judgment to argue that there was no evidence that Muthee struck Ashton, they attempted to stipulate to the very instruction the Court is now considering as a sanction. The stipulation was never formally agreed to by the Plaintiff because the Defendants insisted that the stipulation foreclosed the admission of evidence of their bad faith conduct at trial, obviously aware of its potential prejudicial effect. Obviously, a more severe sanction than an instruction similar to that already posed by the Defendants is appropriate.

Key to crafting the most appropriate remedy in this case is the requirement that the sanction serve as a deterent to spoliation. A deemed admission or a less severe sanction such as attorneys fees caused by their conduct might conceivably encourage Muthee, Knight, and similar defendants to conceal and destroy evidence against them in the future. Why not, if it aids them in avoiding liability and carries minimal risk by way of consequences to the enterprise? It cannot be overlooked that here, if not for the displaced fairing left at the accident scene, it is unlikely that Muthee or Knight would have been tied to the accident scene. Defendants in similar accident situations must be on notice that fleeing the scene and destroying evidence of their involvement will carry a stiff penalty, a penalty so harsh that it stops this type of conduct in its tracks. Consideration of this requirement weighs heavily in favor of a harsher sanction.

Before imposing severe sanctions such as striking pleadings or dismissal, a court should "carefully balance the policy favoring adjudication on the merits with competing policies such as the need to maintain institutional integrity and the desirability of deterring future misconduct." *National Hockey League v. Metropolitan Hockey Club*, 427 U.S. 639, 643 (1976)). Having weighed these considerations, the Court finds that the sanction most suited to Defendants' destruction of evidence is to strike their pleadings and defenses to liability. Such a sanction has the effect of essentially deeming admitted *both* that Muthee struck Ashton *and* that Ashton was alive at the time he was struck. This remedy also ameliorates the prejudice caused by Defendants' spoliation because it prevents them from arguing that the lack of physical evidence is proof that Muthee did not strike Ashton or that without such evidence Plaintiff cannot show Ashton was alive when he was struck. Eliminating their defenses to liability will also solidly deter these Defendants and other parties from

engaging in similar spoliatory conduct. Parties tempted to engage in such egregious conduct will be on notice that doing so will forfeit their right to contest liability.

The Court finds this remedy to be the least harsh remedy necessary to deter, punish, and restore. Defendants retain their ability present evidence on and argue the proper allocation of blame under the Texas Proportionate Responsibility Statute, TEX. CIV. PRAC. & REM. CODE §§ 33.001-.004. While the Defendants may still argue their proportionate share of liability, this should not be interpreted to mean that evidence of their spoliation will be excluded from the trial. To the contrary, it is highly likely that such evidence will be relevant to determining the Defendants' share of the fault for Don Ashton's death. Finally, because Defendants' misconduct led to Plaintiff's late discovery of an alleged potential claim for punitive damages, the Court finds that Plaintiff should be allowed to file an Amended Complaint that solely adds a claim for punitive damages.

## V.

## CONCLUSION

The Court finds that Defendants Knight Transportation and George Muthee spoliated evidence. Accordingly, Plaintiff's Motion for Sanctions is **GRANTED**, and the Court **STRIKES** Defendants' pleadings and defenses to liability. The Court also **DIRECTS** Plaintiff, if she so chooses, to file an Amended Complaint that only adds a claim for punitive damages on or before **Friday, March 4, 2011**. The parties are directed to submit a Joint Status Report indicating which of the following trial dates are schedulable: April 18th, April 25th, May 2nd, May 9th, and May 16th.

SO ORDERED.

DATED February 22, 2011

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE